**Toni PATTERSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–1432.

District of Columbia Court of Appeals.

Submitted March 15, 1990.
Decided Oct. 4, 1990.

---

Ed Wilhite, Washington, D.C., appointed by this court, was on the brief for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Patricia L. Petty, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before ROGERS, Chief Judge, and NEWMAN and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant Patterson was convicted of possession of marijuana and possession of cocaine, both offenses in violation of D.C. Code § 33–541(d) (1988).[1] While testifying at trial, she was asked if she had used drugs the day before, the day after, or the day of her arrest. She was also asked if she had used drugs "during that time." She answered "no" to all of these questions. On appeal Patterson argues that the trial court erred when it permitted the government to introduce test results showing that she had used PCP within fourteen days before her arrest. We find no error and affirm appellant's convictions.

I

On August 21, 1987, police officers executed a search warrant at appellant's apartment in the Paradise Manor apartment complex. When the police entered the apartment, they found seven persons inside, including a baby. Officer James Beadel testified, "When the door swung open ... I noticed a subject behind the door. When the door hit this person, I heard a thump to the floor. I reached back. It was a young black male and I pulled him from behind the door...." Beadel also said that he did not notice anyone else in the immediate vicinity of the door "at that time." Beadel "removed [the man] from behind the door and placed him at the couch."

Officer Tyrone Scott entered the apartment a few moments later.[2] As he crossed the threshold, he heard "movement, footsteps" behind the door. Responding to the noise, he put his foot against the door to trap whoever was there. Then he heard a thud, and from behind the door came a female voice saying, "I'm just putting out the trash." Scott "peeped around the door" and discovered appellant with a green plastic trash bag in her hand. As he looked, he saw two clear packets—one containing several smaller packets with a "white rock-like substance" inside, and one containing a "green weed-like substance"— fall from the bag to the floor. He also saw a gun on the floor between appellant's feet. Appellant was taken into custody by another officer, while Scott remained with the gun and the two packets until they were taken away by Officer Beadel. When asked whether anyone was with appellant behind the door, Officer Scott replied, "Not when I saw her, no, sir."

A thorough search of the apartment yielded two plastic bags containing crack cocaine, a brown paper bag containing ninety-seven more plastic bags of cocaine (hid-

---

1. Appellant was acquitted of three other drug and firearm offenses with which she was also charged.

2. Scott testified that he was the fifth officer to enter the apartment, and that the officers who went in ahead of him were trying to "get control of the individuals inside...."

den behind the television set), and $255 in cash. One of the bags dropped by appellant contained twelve packets of cocaine base totaling 10,820 milligrams; the other contained 2,870 milligrams of marijuana. The gun recovered from the floor was an operable .38 caliber revolver, loaded with five live rounds of ammunition. It was not registered to appellant.

Appellant was the only defense witness. She admitted that the drugs were discovered in her apartment but professed ignorance of them. She said she was upstairs talking to her mother when she first heard the police knocking at the front door. She went downstairs to answer the knock. Just as she reached the door, however, the police pushed it open, and she was "hung behind the door" along with a man named Nicky. The police soon took Nicky from behind the door, but appellant was left there for about five minutes, unable to get out because the police were pushing on the door from the other side. She did not recall hearing a thud, saw no gun, denied dropping anything, and did not see anyone else drop anything. When she was allowed to move away from the door, she said, she did notice some packets of white powder on the floor near where she had been standing. However, she denied that these packets were hers, denied knowledge of the other drugs found in her apartment, and had no recollection of holding a garbage bag while she was standing behind the door.

After appellant had testified at length about the events of August 21, particularly the discovery of drugs behind the television set and elsewhere in her apartment, defense counsel posed the following questions:

Q. Now, in regard to your daughter, Monie Patterson—

Well, before we get to your daughter, Monie Patterson, *during that time* were you using any drugs?

A. No, I wasn't.

Q. Okay. Were you selling any drugs?

A. No, I wasn't. [Emphasis added.]

The questioning then turned to the subject of drug use by others in the apartment. Appellant testified that her daughter had been using drugs and acknowledged that it was "a matter of concern" to her. She also said that her cousin Alfred Patterson, who had been staying with her for about two months (and who was one of the others arrested that day), "had been using drugs for years."

On cross-examination the government further explored the subject of appellant's drug use:

Q. Now, you said on that day that you were not using drugs?

A. No, I wasn't.

Q. On August 21, 1987, were you using drugs?

A. No, I wasn't.

Q. On August 22, 1987, were you using drugs?

A. No, I wasn't.

Q. On August 20, 1987, were you using drugs?

A. No, I wasn't.

Q. And you indicated you were not selling drugs?

A. No, I wasn't.

Appellant also testified that she was employed full-time at a day care center and that the $255 recovered by the police was her money.

In rebuttal, the government called Ann Kennedy, the court liaison officer for the Adult Drug Unit of the Pre-trial Services Agency. Defense counsel immediately objected on the ground that Kennedy's testimony would open up "an entire Pandora's box as to reliability and fairly well-known instances of false drug testing within Pre-trial Services." The judge observed, however, that this court had "found ... that our tests are reliable," alluding to our decision in *Jones v. United States*, 548 A.2d 35 (D.C.1988). The discussion continued:

MR. WILHITE [defense counsel]: [T]he fact that she tested positive for PCP on the 21st does not rebut anything that she said, because, for instance, she might

have used PCP on the 19th, the 18th, a week before.

\* \* \* \* \* \*

MR. KELLY [the prosecutor]: Your Honor, first of all, on direct examination he asked during that period were you using drugs; no.

I asked her, during that period of time; no.

Then I went into specific dates. I asked, really to show that she wouldn't have possibly—

THE COURT: Were you setting the parameters? I thought you were going to go back for several days, because I think—

I don't want to go into all of that. At any rate, you're on the record, Mr. Wilhite. I have ruled. I am going to stand by that ruling. This is permissible as rebuttal evidence.

Kennedy then testified that drug tests administered to appellant after her arrest showed recent use of phencyclidine (PCP). The manufacturers of the test, Kennedy said, warrant that it can detect PCP in the human body up to fourteen days after it has been ingested and claim a ninety-nine percent accuracy rate "when everything is followed correctly." On cross-examination Kennedy stated that appellant had been tested twice and that both tests had been positive for PCP; "the retest ... confirmed the first positive reading."[3]

## II

"It is well settled that a party may not present extrinsic evidence to impeach a witness on collateral issues." *Washington v. United States*, 499 A.2d 95, 101 (D.C.1985) (citations omitted). Testimony is excludible on this ground if it "would not have been admissible independently for any purposes other than ... contradiction." *McClain v. United States*, 460 A.2d 562, 569 (D.C. 1983) (citations omitted). While certain types of testimony are allowed for impeachment, it is generally held that "[f]acts showing misconduct of the witness (for which no conviction has been had) ... are collateral, and if denied on cross-examination cannot be proved to contradict." E. CLEARY, MCCORMICK ON EVIDENCE § 47, at 111 (3d ed.1984) (footnote omitted).

■ This rule, however, is not without its exceptions. The one we find pertinent here is discussed by Professor McCormick:

Finally, a third kind of fact must be considered. Suppose a witness has told a story of a transaction crucial to the controversy. To prove him wrong in some trivial detail of time, place or circumstance is "collateral." But to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for, although the contradiction is otherwise inadmissible because it is collateral under the tests mentioned above. To disprove such a fact is to pull out the linchpin of the story. So we may recognize *this third type of allowable contradiction, namely, the contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true.* This test is of necessity a vague one because it must meet an indefinite variety of situations, and consequently in its applications a reasonable latitude of discretionary judgment must be accorded to the trial judge.

*Id.* at 111–112 (footnotes omitted and emphasis added). As this passage indicates, evidence technically classified as collateral may be admitted, in the trial court's discretion, provided it has sufficient bearing on the issues which the trier of fact must

---

**3.** The particular test used here is known as the Enzyme Multiple Immunoassay Test ("EMIT"). We held in *Jones v. United States, supra,* that EMIT results are admissible, provided that the test is conducted twice and both tests yield a positive result. We specifically did not decide "whether a single positive EMIT result meets the requisite standard" for admissibility. 548 A.2d at 45 n. 7. *See also United States v. Roy,* 114 Daily Wash.L.Rptr. 2481 (D.C.Super.Ct. December 1, 1986).

resolve. Because the test of admissibility is, as McCormick says, "a vague one," the court's discretion is correspondingly broad.

In *Jones v. United States, supra,* we considered a scenario almost identical to that presented here. The defendant in that case testified on cross-examination that he had not used cocaine on the day he was arrested, nor had he used it previously. In rebuttal, the government presented a witness who said that Jones had tested positive for cocaine and PCP the day after his arrest. Rejecting a challenge to the admissibility of this rebuttal testimony, we said:

> The prosecutor's questions on cross-examination about appellant's prior cocaine use were relevant, and thus proper, in view of appellant's defense. Appellant testified that he had found the packets of cocaine and was unaware of their contents. ... In short, appellant attempted, on direct examination, to portray himself as an innocent bystander who had stumbled upon something illicit. *The prosecutor's questions on cross-examination and the government's subsequent rebuttal evidence comprised legitimate exploration of two issues that appellant himself had raised: his sophistication with respect to drugs and his general credibility.*

548 A.2d at 39 (citations omitted and emphasis added).

██ In the case now before us, appellant's testimony was similar to that of the defendant in *Jones.* Appellant claimed innocent presence and an unfamiliarity with drugs, attempting at the same time to implicate her daughter and cousin, who lived in the apartment with her. Indeed, when stating that she saw the packets of drugs lying on the floor, she added that she "had never seen anything like that before." She portrayed herself as a hard-working breadwinner and concerned mother trying to cope with her daughter's drug problem. As in *Jones,* the rebuttal was used to challenge appellant's asserted lack of sophistication with respect to drugs as well as her general credibility. In *Jones* the defense contended that, although Jones had cocaine on his person when arrested, he had previously found it on the street and did not know what it was. In the instant case, appellant maintained that she had no knowledge of the drugs found in her apartment and that she had not dropped the packets which the police found near her feet. Thus the EMIT results had a similar purpose and effect in both cases. In the words of Professor McCormick, appellant's use of drugs was something "which as a matter of human experience [she] would not have been mistaken about if [her] story were true." McCormick, *supra* at 112 (footnote omitted). Given the nature of appellant's defense, and considering that her testimony was the only exculpatory evidence, we hold that the trial court did not abuse its discretion in allowing the government to introduce the rebuttal evidence about appellant's drug tests.

Our holding is reinforced by the following excerpt from *United States v. Beno,* 324 F.2d 582 (2d Cir.1963), discussing a different but related exception to the collateral issue rule, which we quoted with approval in *Johnson v. United States,* 373 A.2d 596, 598 (D.C.1977):

> [W]here a defendant, in his direct testimony, falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied *as to that fact* .... The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered misstatement.

*Beno, supra,* 324 F.2d at 588 (citations omitted); *see also Cowan v. United States,* 331 A.2d 323, 325–326 (D.C.1975) (evidence of illegally seized drugs admissible to impeach defendant's credibility in bribery trial when defendant's direct testimony implied he was not using drugs); *United States v. Bell,* 165 U.S. App.D.C. 146, 152–154, 506 F.2d 207, 213–215 (1974) (when defendant represented that he had never sold drugs, evidence of prior drug buy was "vital" to the jury's assessment of his credibility). While *Johnson* and *Beno* make clear that this exception to the collateral issue rule does not amount to *carte*

*blanche,*[4] it is also clear that the decision to admit evidence of a defendant's false statement as to a specific fact is a matter within the trial court's discretion, subject to reversal only on a showing that such discretion has been abused.

Appellant also argues that the rebuttal evidence should have been excluded as irrelevant. This contention is plainly without merit. "The test of relevancy for [the purpose of cross-examination] is ... whether the answer will assist the trier of fact in evaluating [the witness'] credibility and in assessing the probative value of the witness' direct testimony." *Brown v. United States,* 409 A.2d 1093, 1099 (D.C.1979) (citation omitted). Furthermore, a trial court determination of relevancy is reviewable only for abuse of discretion. *E.g., Reavis v. United States,* 395 A.2d 75, 78–79 (D.C. 1978). We see no abuse of discretion here, particularly in light of the obvious impact of the challenged evidence on appellant's credibility.

 Finally, appellant contends that the government did not lay an adequate foundation for its rebuttal testimony. From the record, however, it is obvious that appellant herself laid the requisite foundation when her counsel asked her on direct examination whether she had been using drugs "during that time," and she answered that she had not. The trial court recognized this when the prosecutor, just before beginning his cross-examination, requested permission (at a bench conference) to ask appellant about the drug tests she had taken. When defense counsel objected, the court said:

> THE COURT: I think that if she, if I understand the proffer, she has denied that she was using drugs around the time she was arrested.
>
> MR. WILHITE: Yes.

THE COURT: In the [case] where she's charged with these offenses, if he asks her if in fact she was using drugs around the time, she says, no, pin her down on that, then her denial sets up the prosecutor's right to show that she's not testifying truthfully. Credibility is always an issue.

Although it might be argued that the prosecutor did not "pin her down" as effectively as he might have, his failure to ask specifically if appellant had used drugs during the fourteen days prior to her arrest is not critical. Originally, the prosecutor sought to ask appellant whether she recalled being tested for drugs at the time of her arrest. Because of the potential implication that appellant had been singled out for testing, the court would not allow this question to be asked. Indeed, defense counsel objected to any cross-examination about the drug test, stating, "I of course would object to his asking whether she was tested for drugs.... I'm not even sure that she knows what the result of the drug test is. But somehow or other the government is going to have to prove that independently of her." The prosecutor did just what defense counsel suggested: he did not ask about the drug test on cross-examination, and he introduced the EMIT results "independently of her" through another witness, and only for impeachment purposes.[5] On this record we are satisfied that there was an adequate foundation for the rebuttal evidence.

There being no other assignment of error, the judgment of conviction is

*Affirmed.*

---

**4.** *See Johnson, supra,* 373 A.2d at 598, quoting *Beno, supra,* 324 F.2d at 588 (government is not "entitled to explore without restraint and at great length *any* specific occurrence which might tend to create an abhorrent image of the defendant" (emphasis in *Beno*)).

**5.** The trial court, immediately after the rebuttal testimony was concluded, gave a cautionary instruction to the jury about the limited purpose for which it was introduced:

> That last piece of evidence offered in rebuttal by the government was solely on the issue of the credibility of the defendant, Toni Patterson, as a witness in this case. You must not view that evidence as evidence of guilt of the charges for which she is on trial.