Jose M. FLORES (No. 97–CF–399),
and Jose T. Marino (No. 97–
CF–548), Appellants,

v.

UNITED STATES, Appellee.

Nos. 97–CF–399, 97–CF–548.

District of Columbia Court of Appeals.

Argued March 16, 1999.
Decided Oct. 26, 2000.

Maria Carlotta Mendoza, Washington, DC, appointed by the court, for appellant Flores.

Lauckland A. Nicholas, appointed by the court, for appellant Marino.

Janice K. Myhand, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Michael T. Ambrosino, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY, Associate Judge, and KING, Senior Judge.

KING, Senior Judge:

Appellants Jose M. Flores ("Flores") and Jose T. Marino ("Marino") were found guilty by a jury of unlawful possession with intent to distribute a controlled substance, in violation of D.C.Code § 33–541(a)(1) (1996). Appellant Marino argues (1) that the arresting officers did not have reasonable articulable suspicion to conduct an investigative stop; and (2) alternatively, that the officers' actions constituted an unwarranted extension of the investigative stop. Appellant Flores argues that the trial court abused its discretion by permitting the government to cross-examine him as to his use of crack/cocaine, and by allowing the government to contradict his subsequent denial with his positive drug test results. We affirm.

On April 18, 1996, at approximately 8:15 p.m., Investigator William Witkowski and Detective Jose Solloso were driving in an unmarked police car in the 1400 block of Park Road when they noticed appellants Marino and Flores standing next to each other on a nearby sidewalk. Witkowski and Solloso were about twenty feet away when they noticed "Marino hand Flores a green cylinder like tube, a ChapStick con-

tainer." The officers pulled their vehicle up to the two men and were about eight to ten feet away when Flores noticed the car and the officers and dropped the container to the ground. Marino then placed his foot on top of the ChapStick container. The plainclothed officers exited the car, identified themselves, and detained Marino and Flores. Detective Solloso then "backed up Marino a couple of steps and reached down and recovered the ChapStick container from under his foot." Inside the container were ten white rock-like substances, later identified as cocaine.

Investigator Witkowski testified that he had participated in more than one thousand drug arrests, at least fifty of which occurred around the 1400 block of Park Road, an area "notorious for the sale of crack/cocaine." Furthermore, Witkowski testified that ChapStick containers recently have become a common means of packaging cocaine.

In addition to the evidence revealed at the suppression hearing, the government presented evidence at trial that Flores carried $60 and two pagers, and Marino possessed $346 and one pager. Appellants were convicted by a jury of unlawful possession with intent to distribute a controlled substance, in violation of D.C.Code § 33–541(a)(1). These appeals followed.

I. Marino's Appeal

Prior to trial, Marino filed a motion to suppress the cocaine, arguing that the police did not have evidence sufficient to justify the initial stop. The trial court denied the motion.

In this appeal, Marino presents two arguments in support of his contention that the seizure was unlawful. First, he argues that the officers did not have reasonable articulable suspicion to conduct an investi-

gative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Second, Marino maintains that Officer Solloso's removal of his foot from the ChapStick container constituted an unwarranted extension of the *Terry* stop. Accordingly, Marino contends that the trial court erred in denying his motion to suppress the cocaine evidence found in the ChapStick container.

■ In support of his contention that the officers did not have reasonable articulable suspicion to conduct a *Terry* stop, Marino argues that "the only reason for [his] seizure and subsequent arrest was the fact that he and [Flores] were present in an area that is know for crack cocaine." On this record, Marino's argument is unavailing.

In reviewing the trial court's denial of a motion to suppress, the scope of our review is limited. *Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991). We must defer to the trial court's findings of fact. *Lawrence v. United States*, 566 A.2d 57, 60 (D.C.1989). We view the evidence in the light most favorable to the prevailing party, and "all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted). Whether the evidence establishes that there was a reasonable articulable suspicion is reviewed de novo. *Brown*, supra, 590 A.2d at 1020.

■ The police may briefly detain a person for an investigatory or *Terry* stop, even if they lack probable cause, if the officers have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry*, supra, 392 U.S. at 30, 88 S.Ct. 1868). In evaluating the reasonableness of an officer's suspicions, a reviewing court must consider the "totality of the circumstances-the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). One of the circumstances properly considered is the " 'demonstrated expertise of police officers in recognizing distinctive packaging used in the drug trade for smaller quantities,' especially when there [is] evidence 'describing the arresting officer's experience with the particular packaging.' " *In re J.D.R.*, 637 A.2d 849, 851 (D.C.1994) (quoting *United States v. Prandy Binett*, 302 U.S.App.D.C. 1, 5, 995 F.2d 1069, 1073 (1993), cert. denied, 510 U.S. 1167, 114 S.Ct. 1196, 127 L.Ed.2d 545 (1994)).

Contrary to Marino's assertion, the trial court did not rely solely on the drug trafficking reputation of the 1400 block of Park Road in concluding that the stop was reasonable. The trial court based its conclusion that the stop was reasonable in light of the totality of the circumstances, including: (1) the officers' experience in recognizing that ChapStick containers were commonly used to package cocaine; (2) the transfer of the ChapStick container, a personal item not normally subject to sharing; (3) Flores' surprised reaction and immediate disposal of the ChapStick container upon seeing the officers; and (4) Marino's attempt to covertly repossess or hide the ChapStick by placing his foot on top of the container. Certainly, these facts are sufficient to warrant a reasonable person to suspect that Flores and Marino were engaged in a drug transaction.

■ Marino next argues that the officer's conduct in backing him up so as to remove his foot from atop the ChapStick container constituted an unwarranted extension of the *Terry* stop. Based on the general principles established in *Terry*, we hold that the officer's removal of Marino's foot from the ChapStick container was a

reasonable investigatory procedure for resolving the suspicious circumstances that initially justified the stop.

 A *Terry* seizure involves a "temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C.1993), cert. denied, 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994) (citations omitted). Thus "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

 This intermediate response or "investigative seizure must be 'reasonably related in scope to the justification for [its] initiation.' " *United States v. Wylie*, 186 U.S.App.D.C. 231, 239, 569 F.2d 62, 70 (1977) (quoting *Terry*, supra, 392 U.S. at 29, 88 S.Ct. 1868). In determining reasonableness, "the facts [must] be judged against an objective standard: would the facts available to the officer at the moment of seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, supra, 392 U.S. at 21–22, 88 S.Ct. 1868 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

In *District of Columbia v. M.M.*, 407 A.2d 698, 701 (D.C.1979), we applied this objective standard and held that an investigative seizure was reasonable under *Terry* where an officer transported two robbery suspects, who matched a radio description, one mile for a viewing by an eyewitness. In evaluating the reasonableness of the intrusion on the suspects, we considered "the brief period of time consumed in the transport, the proximity of the place of the stop to the scene of the crime, and the purpose of the transport." *Id.*

Here, following the logic of *M.M.*, it would be antithetical to conclude that an officer may transport a suspect one mile for a show-up based on suspicion created solely from a witness' description, and yet prevent the same officer with an even stronger suspicion based on his own experience and perception to simply move the suspect a few inches to confirm his suspicions. Barring such a minor intrusion would be tantamount to requiring the officer to "shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, supra, 407 U.S. at 145, 92 S.Ct. 1921. We are not prepared to so rule under the circumstances presented here. Accordingly, we hold that Officer Solloso was acting within the bounds of a *Terry* stop when he backed Marino's foot off of the ChapStick container and confirmed his reasonable suspicion.

## II. Flores' Appeal

On direct examination, Flores testified that he was in the 1400 block of Park Road on an errand to repair his wife's beeper, when he saw his friend Marino. Flores approached Marino and allegedly asked him for a quarter to make a phone call. However, Flores testified that before Marino could give him the quarter, the police arrived and arrested both men. Flores also testified that he never saw or handled the ChapStick container.

Prior to cross-examining Flores, the government approached the bench for permission to impeach the "innocent bystander" defense that Flores related during direct examination, with a positive drug test taken after his arrest. The trial court

rejected defense counsel's objection that the drug test was beyond the scope of Flores' direct testimony, and permitted the government to question Flores "on what brought him to where he was arrested" and perhaps about his use of drugs, if that was where Flores' answers led. The trial court also noted that the government was free to impeach Flores' direct testimony "by showing that he had given an untruthful account of what occurred" even if it extended to Flores "affirmatively stating that he doesn't know anything about drugs ... [or] that he had never seen any [drugs]."

The bench conference concluded and the ensuing cross-examination brought the following exchange:

Government: Is it your testimony, sir that you were not there to use or buy drugs that evening, correct?

Mr. Flores: No, sir.

Government: And you've never at any time gone into that area to buy drugs?

Mr. Flores: No, sir.

Government: Or to sell drugs?

Mr. Flores: No, sir.

Government: You've never seen crack/cocaine before?

Defense Counsel: Objection, Your Honor.

Court: Overruled

Mr. Flores: No, sir.

\* \* \*

Government: Sir, isn't it true that on July 17, 1996, you went down to take a drug test?

At this point in the cross-examination defense counsel again objected, this time on the basis that the government did not establish a proper foundation to ask Flores about the drug test. The trial court rejected counsel's argument and permitted the government to impeach Flores' "inno-cent bystander" defense, noting that if Flores was "acquainted with drugs and was using drugs ... it is less likely that he was there for an innocent purpose."

■ On appeal, Flores argues that the trial court abused its discretion by allowing the government to cross-examine him as to his use of crack/cocaine, and consequently, by permitting the government to contradict his subsequent denial with his positive drug test. Before considering the admissibility of the positive drug test, we must first consider the propriety of the government's cross-examination of Flores' prior drug use.

■ "When a defendant in a criminal trial takes the stand the scope of cross-examination is very broad." *United States v. Raper*, 219 U.S.App.D.C. 243, 248, 676 F.2d 841, 845 (1982). "The prosecutor may cross-examine not only about the facts asserted by a defendant in testimony, but may also ask questions reasonably related to the inferences to be drawn from the direct testimony." *Kinard v. United States*, 635 A.2d 1297, 1306 (D.C.1993) (citing *Raper*, supra, 219 U.S.App.D.C. at 248, 676 F.2d at 845). Although the prosecutor cannot "set up" the defendant on crossexamination, *Bourn v. United States*, 567 A.2d 1312, 1315 n. 3 (D.C.1989), where "appellant attempt[s], on direct examination, to portray himself as an innocent bystander who had stumbled upon something illicit" the government can explore "his sophistication with respect to drugs and his general credibility." *Jones v. United States*, 548 A.2d 35, 39 (D.C.1988) (where appellant's defense was that he found packets of cocaine and was unaware of their contents) (citations omitted); see also *Patterson v. United States*, 580 A.2d 1319, 1323 (D.C.1990) (government's use of appellant's positive drug tests on cross-examination was proper to contradict appellant's defense that she had no knowl-

edge of drugs found in her apartment and that she "had never seen anything like that [i.e., drugs] before."). "Furthermore, a trial court determination of relevancy is reviewable only for abuse of discretion." *Id.* at 1324 (citations omitted).

Here, the government's cross-examination of Flores' prior cocaine use was relevant in view of his proffered defense. On direct, Flores testified that he was in the 1400 block of Park Road on an errand, the implication being that he did not frequent the high drug area to buy and distribute cocaine. Therefore, the prosecutor's cross-examination comprised legitimate exploration of two issues raised by Flores himself: his general credibility and the innocence of his presence in an area notorious for drugs. Accordingly, the trial court was well within the bounds of its discretion in permitting the government to question Flores about his use of cocaine.

■ With the relevance of the government's cross-examination firmly established, the next issue is whether the trial court abused its discretion in permitting the government to use Flores' positive drug test to contradict his denied cocaine use.

■ "It is well settled that a party may not present extrinsic evidence to impeach a witness on collateral issues." *Washington v. United States*, 499 A.2d 95, 101 (D.C. 1985) (citations omitted). "While certain types of testimony are allowed for impeachment, it is generally held that '[f]acts showing misconduct of the witness (for which no conviction has been had) ... are collateral, and if denied on cross-examination cannot be proved to contradict.' " *Patterson*, supra, 580 A.2d at 1322 (quoting E. CLEARY, MCCORMICK ON EVIDENCE § 47, at 111 (3d ed.1984)). However, an exception to this general rule allows the government to contradict "any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true. This test is of necessity a vague one because it must meet an indefinite variety of situations, and consequently in its applications a reasonable latitude of discretionary judgment must be accorded to the trial judge." *Id.*

One circumstance to which we have applied this exception is factually similar to this case. In *Patterson*, the government was permitted on rebuttal to introduce a positive drug test to refute appellant's testimony "that she had no knowledge of the drugs found in her apartment and that she had not dropped the packets which the police found near her feet." *Id.* at 1323. We concluded that the trial court did not abuse its discretion in permitting the drug test "[g]iven the nature of appellant's defense, and considering that her testimony was the only exculpatory evidence." *Id.*

Here, the reasoning in *Patterson* applies. In light of Flores' "innocent bystander" defense, the trial court did not abuse its discretion in admitting the extrinsic evidence of Flores' positive drug test to contradict his denied use of cocaine on cross-examination.

Accordingly, we affirm.

So ordered.

WAGNER, Chief Judge, dissenting:

Assuming the validity of the investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), I cannot agree that the search and retrieval of the chapstick from Marino was justified under *Terry* principles. Police are not at liberty to conduct a search of a citizen for contraband every time they make an investigatory stop. *Id.* at 30, 88 S.Ct. 1868; see *Upshur v. United States*, 716 A.2d 981, 983 (D.C.1998). "Before [a police officer]

places his hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *Upshur*, 716 A.2d at 984. The police did not have such grounds in this case. Here, the officer grabbed Marino and moved him back to search under his foot in order to recover the chapstick which he suspected might contain drugs. This was simply a stop and search for drugs. In my view, this was an inadequate basis for a seizure under *Terry*. See *Terry*, 392 U.S. at 29, 88 S.Ct. 1868; *Upshur*, 716 A.2d at 983–84. Therefore, I respectfully dissent from the opinion of the court.