**Dexter D. DAVIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 99–CF–1514.**

District of Columbia Court of Appeals.

Argued June 12, 2001.
Decided Sept. 20, 2001.

Before TERRY, STEADMAN and REID, Associate Judges.

STEADMAN, Associate Judge:

██ Appellant was stopped by police and found in possession of drugs on two separate occasions in November 1997.[1] Appellant challenges the trial court's denial of his motions to suppress the evidence for both days on the ground that his Fourth Amendment rights were violated. We hold that the trial court correctly found probable cause for the November 3 arrest and resultant search, but that on the record here, the motion to suppress should have been granted with respect to the November 8 stop.[2]

## I. Facts

At the pretrial hearing on appellant's motions to suppress, the following facts relative to each incident were developed.

### A. November 3, 1997

Jeffrey Clay, a police officer for seventeen years, had been involved in several hundred arrests, many of them related to drugs. On November 3, 1997, at approximately 7 p.m., Officer Clay and an officer

Jerry Ray Smith, appointed by the court, for appellant.

Earl M. Campbell, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr. and Adam L. Rosman, Assistant United States Attorneys, were on the brief, for appellee.

1. A jury found appellant guilty of unlawful possession with intent to distribute a controlled substance in a drug free zone, in violation of D.C.Code §§ 33–541(a)(1), –547.1 (1998 Repl.), for an incident on November 3, 1997. The court, after the parties stipulated to the evidence, found appellant guilty of unlawful possession of a controlled substance, in violation of § 33–541(d), for an incident on November 8, 1997. The trial court suspended the concurrent sentences of twenty months to five years for the possession with the intent to distribute count and one hundred and eighty days for the simple possession count, and placed appellant on one year probation for each offense, to run concurrently.

2. Appellant also contends that the District's drug-free zone statute, D.C.Code § 33–547.1, violates his fundamental right to freedom of

movement and thus requires strict scrutiny. This is a meritless argument. Other courts have upheld this type of statute against constitutional attacks based on various constitutional provisions. *See, e.g., United States v. Holland,* 258 U.S.App.D.C. 236, 810 F.2d 1215 (1987); *New Jersey v. Brown,* 227 N.J.Super. 429, 547 A.2d 743 (L.1988). Any fundamental right to travel does not encompass a right to engage in intrastate illegal drug activity within 1000 feet of a school. *See Holland,* 258 U.S.App.D.C. at 239–40, 810 F.2d at 1218–19 ("The statute does not proscribe activities that are legally protected, much less fundamental[.]"); *Brown,* 547 A.2d at 747 ("[H]ere we are not dealing with any fundamental rights because there is no fundamental right to possess cocaine with intent to distribute.").

in training (Officer Lamont Carter) were in a squad car patrolling the area around 5th and I Streets, N.W., in Washington, D.C., which was known to be a high drug area. Appellant was standing approximately 50 feet away at the corner of 5th and I Streets, "displaying something in his right hand to a black female, who had U.S. currency in her hand." Officer Clay described appellant's actions at the time as "pushing his fingers over what was in his hand.... Like he was moving something around with his left hand in his right hand." Although the officer said that he initially felt the woman was carrying money simply because of "the way it was in her hand", he was sure it was money once they pulled up to appellant because "[s]he had it clenched, and some of the money was sticking outside of her hand." Officer Clay knew the woman from experience and complaints from neighborhood citizens as someone who frequented that particular corner—"she is suspected of doing illegal activity of different kinds, illegal activity."

> [W]e pulled out of the alley and pulled right over to where they were. Then she clenched the money that was in her hand, like in a fist like, and he balled his hand up. They started walking northbound on 5th Street, and that would be in the 900 block. And as I pulled my car up toward the curb on the wrong side of the street, as where they were walking, Mr. Dexter Davis put the objects he had in his hand, or object, inside of his sleeve pocket.... [W]e jumped out of the car, and I asked both of them to put their hands up, put their hands on the car, and I patted down the sleeve right there where he had put the object.

On cross-examination, the officer explicitly stated that he was not looking for weapons when they began looking in appellant's sleeve. The following colloquy then took place at the suppression hearing:

> Q: Let me stop you for a second. Why did you stop them?

> A: Because I suspected them of making—getting ready to make a drug transaction or were dealing with drugs on that corner.

> Q: Why did you think that's what was happening?

> A: 'Cause usually when somebody has U.S. currency on that corner and somebody's showing something to them in their hand, that's what goes on right there at that corner.

> Q: How do you know that?

> A: Because I've been out there 14, 15 years doing that.

After patting appellant's sleeve for one or two seconds, and feeling "several loose rocks" inside the pocket, which Officer Clay thought to be crack cocaine, he removed several ziplock bags containing fifteen small loose rocks and a larger rock. These field tested positive for cocaine, after which appellant was placed under arrest.

Sandra Levi, the woman referred to by Officer Clay, testified for the defense. She stated that she and appellant were talking and walking to the store, when the officers came out of the alley, got out of their car, and told them to put their hands up. Ms. Levi denied trying to exchange anything with appellant or even holding any money towards appellant, and denied that appellant tried to show anything to her that day.

Crediting the officer's testimony over Ms. Levi, the trial court made the following findings:

> We've got a high narcotics area, we have officers watching somebody who has been a focal point of some complaints in the neighborhood, although—for criminal activity, although that's undefined. That's referring to Ms. Levi. We have Ms. Levi with currency in her hand, and the defendant with something that the

officer doesn't know what it is in his hand but showing it to Ms. Levi in a way that this officer experienced in drug transactions says leads him to believe that a drug transaction is about to happen; displaying it, in other words, in a way somebody would who is displaying drugs for sale, but he doesn't see what's in the hand. Although he is not clear that it's currency, as he approaches he sees that it's currency. So, clearly it's currency in her hand which she clutches upon seeing the police, and the defendant takes what he has in his hand and, upon seeing the police, hides it in his pocket, and the two of them walk away as they see the police approaching.

In finding probable cause for the arrest, the court denied the motion to suppress, and concluded:

I think the police had probable cause to arrest here, based on all the factors I've identified. And just to be clear again, I am—I credit the testimony of the police officer in its entirety, and I think I've identified the factors that I think were significant. I have seen the officer's gesture that he made with his hand, which was a gesture of displaying something, and there was currency in the hand of the other person. I don't think this was just a one-way transaction as a result of that. I think the officers were justified in believing that a drug transaction was about to take place before they interrupted it. I actually think that the officer acted very reasonably in feeling the pocket first before going in, given what he had observed, but I think that the correct analysis is that that touching, which was not for the purposes of frisking for weapons, had to be justified by probable cause.

B. November 8, 1997

The only government witness for the November 8 incident was Officer Lamont Carter, the officer in training who had been on the force for a little over a year and who had been with Officer Clay at the November 3 incident. On November 8, he and his partner received a radio run of an assault in progress at 5th and H Streets, N.E., with a description for a lookout for "a black male wearing a black jacket, blue jeans and a green shirt." Within two minutes, the officers drove up "with lights and sirens." At the 400 block of H Street, which is approximately a one minute walk from the scene of the assault, the officer saw appellant walking from about ten to fifteen feet away, fitting the description given in the radio run. Officer Carter acknowledged that he recognized appellant as the same man he and Officer Clay arrested on November 3, but he did not realize this until after they had stopped appellant. "When we got to the location, I got out of the car, and then I asked Mr. Davis to come over to the car."

At that point, a female "approached us, she just said 'Everything is okay. It's all right. There's no more problem.'" "[A]fter that, just to investigate a little further, I had Mr. Davis put his hands on his car. Then I proceeded to do what's called a pat down ... for my safety and my partner's safety, I wanted to check to see if he had any weapons on him." Upon patting appellant's rear pant pocket, the officer felt hard pebbles, which turned out to be four clear ziplocks containing a white rock-like substance. Appellant was placed under arrest.

The trial court denied appellant's motion to suppress:

I credit the officer's testimony. He received a radio run from 5th and H Street for a man in a black jacket, blue jeans—a black male in a black jacket, green shirt and blue jeans, responded and was there within a couple minutes and saw the defendant between 4th and 5th on H Street, closer to 4th than 5th,

with a woman nearby who said that there was no longer a problem before; that the police officer had a right to make a *Terry*[3] stop at that point and, given that the report had been for assault in progress, found that he had a right to conduct a *Terry* frisk, and that that's what he did. And then in the course of doing the *Terry* frisk, he felt what he said felt like pebbles, which I don't exactly agree with defense counsel's characterization of what he said there. I mean what he felt was consistent with what he had—of crack cocaine that he had felt before on a limited number of occasions. He wasn't a particularly experienced officer, but it was certainly legitimate for him to take into account that he knew that this defendant only days earlier had been arrest[ed] for PWID cocaine.

## II. Legal Analysis

▆▆▆▆ In reviewing the trial court's denial of the motions to suppress, the scope of our review is limited. *Flores v. United States*, 769 A.2d 126, 129 (D.C.2000). "We view the evidence in the light most favorable to the prevailing party, and 'all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling.'" *Id.* (citation omitted). While this court will defer to the trial court's findings of fact, we review its conclusions of law de novo. *Id.* Whether or not the officers had probable cause on November 3 and reasonable suspicion to justify a *Terry* stop on November 8 are questions of law. *McFerguson v. United States*, 770 A.2d 66, 73 n. 10 (D.C.2001) (reasonable suspicion); *Sanders v. United States*, 751 A.2d 952, 954 (D.C.2000) (probable cause).

### A. November 3, 1997

Appellant contends that there was no probable cause for the police officers to stop and search him without a warrant. The thrust of his argument is that no transaction took place, and therefore, under our prior cases, without a completed two-way transaction, there could not be probable cause here. The government counters that this was a transaction in progress, and that because of the several factors in this case that were not present in other cases, the circumstances do rise to the level of probable cause here. We agree with the government, and hold that in light of these other factors, the officers were not required to wait until the transaction was completed to arrest and search appellant without a warrant.

▆▆▆▆ Under the Fourth Amendment of the United States Constitution, an officer cannot conduct a warrantless search of a person, absent certain exceptions, without probable cause. The test for determining probable cause is whether " 'a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience,' would be warranted in the belief that an offense has been or is being committed." *Peterkin v. United States*, 281 A.2d 567, 568 (D.C. 1971) (citations omitted); *see also Hill v. United States*, 627 A.2d 975, 979 (D.C. 1993) (probable cause requires that the arrest be objectively reasonable under the "totality of the circumstances"). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians,

---

**3.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

act." *Id.* at 231, 103 S.Ct. 2317 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)); *see also Pope v. United States*, 739 A.2d 819, 828 n. 21 (D.C.1999) (probable cause "does not demand any showing that the officer's belief that he has witnessed criminal behavior be correct or more likely true than false") (citations omitted). And if we find that the officers had probable cause to arrest appellant, then the drugs found on his person would be admissible under the "search incident to an arrest" rule. *See Mitchell v. United States*, 746 A.2d 877, 890 (D.C.2000).

■ As so defined, probable cause existed here in the totality of the circumstances to justify the stop and search of appellant. Officer Clay was an experienced officer, and had been involved in over one hundred drug-related arrests. *Dickerson v. United States*, 677 A.2d 509, 512 & n. 4 (D.C.1996) (officer's training and experience is a relevant factor); *see also United States v. Prandy–Binett*, 302 U.S.App.D.C. 1, 3, 995 F.2d 1069, 1071 (1993) ("[P]robable cause is evaluated not only from the perspective of a prudent man, but also from the particular viewpoint of the officer involved in the search or seizure.") (citations omitted). The location of the search, 5th and I Streets, N.W., was known to be a high narcotics area. *See Peterkin, supra,* 281 A.2d at 568 (relevant to probable cause that "neighborhood was one frequented by narcotics users"). Officer Clay felt that the manner in which appellant was holding and displaying the

object in his hand was suggestive of a drug transaction, and the woman was holding currency in her hand. *Thompson v. United States,* 745 A.2d 308, 314 (D.C.2000) (looking to appellant's behavior as being consistent with that of someone engaging in a narcotics transaction). Officer Clay also had received complaints from neighborhood citizens that Ms. Levi, the other individual involved in the transaction, was regularly engaged in "illegal activity." *See Reyes v. United States,* 758 A.2d 35, 38 (D.C.2000) (when viewing the totality of the circumstances, court can consider that the appellant handed objects to a known drug user), *petition for cert. filed* (July 16, 2001). When officers approached appellant and Ms. Levi, both attempted to conceal what they had been doing and began walking away, with appellant putting the object from his hand into his jacket pocket, and Ms. Levi balling up the currency in her hand. *Tobias v. United States,* 375 A.2d 491, 494 (D.C.1977) (furtive and evasive actions, such as fleeing upon police arrival and attempting to conceal objects, support probable cause determination).[4] Adding in the additional key factor that all indications pointed to the conclusion that a transaction was interrupted but otherwise about to be consummated, as explained below, we agree with the government that "these factors, individually, may not amount to probable cause, [but] when viewed collectively under the totality of the circumstances, Officer Clay had probable cause to believe that appellant and Ms. Levi were about to engage in an illegal

**4.** Appellant devotes considerable time in his brief to argue that this court has stated that most of these factors do not "add much" to the probable cause determination and have been viewed with skepticism. His principal case for this proposition is *Smith v. United States,* 558 A.2d 312 (D.C.1989) (en banc). Appellant claims that *Smith* casts doubt on the strength in the probable cause analysis of several factors: 1) guilt by association with a

known drug user; 2) presence in a high drug area; 3) an officer's experience and knowledge; and, 4) concealment of evidence and flight. Appellant reads *Smith* out of its appropriate context. *Smith* itself indicates that each of these factors may have validity given the proper circumstances. And this court, as well as others, has repeatedly upheld the consideration of these factors in the probable cause analysis.

drug transaction." *See Kelly v. United States*, 580 A.2d 1282, 1285 (D.C.1990) (in determining whether a seizure has occurred under the Fourth Amendment, the court "must take into account not one or two factors considered in isolation, but the totality of the circumstances").

As stated above, in holding that probable cause existed here, we are taking into account our conclusion that the situation is about as close to a completed transaction as possible without an actual exchange of money or drugs. This case is properly viewed as an interrupted transaction; i.e., both parties had begun the transaction in that they were holding the objects necessary to complete the transaction, and were it not for the arrival of the officers, the transaction would have been momentarily consummated. This can be accurately described as the middle situation between a completed two-way transaction and one in which there is evidence only of one side of the transaction, such as the display or delivery of money or drugs alone. Apparently no prior case in our court has involved precisely this middle situation.

 There is no dispute that evidence of a completed two-way transaction, such as an exchange of currency for a ziplock bag, lends support to a finding of probable cause. *See Coles v. United States*, 682 A.2d 167, 168 (D.C.1996). The issue here is whether there is a bright line rule to that effect, or if something short of an actual exchange can lead to that same conclusion. Although appellant is correct in pointing out that we have never found probable cause with evidence of only one side of the transaction, neither have we fashioned a hard-and-fast rule that prevents a finding of probable cause unless police officers wait until an actual transaction is completed. We conclude that, under the right circumstances, evidence of an on-going but interrupted two-way transaction can support a finding of probable cause.

On one side of the scale are cases involving a completed two-way transaction. Appellant points to several of these cases to support his argument. First, he relies on *Peterkin, supra*, 281 A.2d 567, for the proposition that a two-way exchange presents the "borderline situation" for probable cause in a drug transaction case. Anything short of a two-way exchange, the argument goes, must necessarily be insufficient then to satisfy the standard. This reading of *Peterkin*, as well as other cases, for the creation of a bright-line rule that anything short of a completed two-way transaction will be insufficient, is misplaced.

In *Peterkin*, police officers, who had assisted in numerous narcotics arrests and were driving around in a high narcotic area, arrested the appellant after seeing him give something out of a vial to another person in exchange for "two or more singles." *Id.* at 567–68. As the officers approached appellant, he stepped back and placed the vial and money in his pocket. This court sustained the admission of the contents of the vial at trial:

> All this, coupled with the character of the neighborhood, gave rise to reasonable probability that an illegal narcotics transaction had been conducted. As with all *borderline situations* regarding probable cause, innocent explanations for activity may be imagined. But the mere possibility of other interpretations would not suffice to diminish the reasonable likelihood of illegality appearing, from the circumstances, to prudent men possessing the knowledge and experience of the officers in the case at bar.

*Id.* at 569 (footnotes omitted) (emphasis added). Appellant focuses on this language in *Peterkin* to argue that this situation, i.e., the two-way transaction, is the

borderline situation for finding probable cause in a drug transaction case.

However, a subsequent transaction case, *Vicks v. United States*, 310 A.2d 247 (D.C. 1973), expanded on the "borderline situations" being referred to in *Peterkin*. In *Vicks*, after officers observed a man hand money to appellant in a high narcotic area, they stopped appellant while he was walking away. Appellant then attempted to hand a woman a pack of cigarettes in a white handkerchief. Although appellant refused to explain to the police what was in the handkerchief, he told the woman that she could give it to the officers when they asked her for it. Although this court remanded on the issue of whether the consent exception applied, we discussed *Peterkin*:

> We recognized that [*Peterkin* ] presented a borderline situation but held that the two-way exchange tipped the scale from innocent activity to illicit bargaining. Here, of course, there was no 'two-way exchange' and no 'plain view' of the [evidence]. Thus, there existed no probable cause to arrest appellant and seize the handkerchief.

*Id.* at 249.

Although at first reading these cases may appear to create the bright-line rule that appellant urges us to adopt, that simply is not so. Rather, *Vicks* suggests that *Peterkin* was a borderline situation because there were insufficient factors, independent of the two-way exchange, to create a fair probability that contraband would be found on the person. In *Peterkin*, the fact that officers saw an exchange take place tipped the scale. In contrast, in *Vicks*, the officers only saw a man hand money to appellant, suggesting, at the most, the completion of one-half of a transaction. When read together, *Peterkin* and *Vicks* suggest that the real key in these cases is how the observed transaction fits into the totality of the circumstances. If there are sufficient other factors present, one need not always have a completed two-way transaction to create probable cause.

There are, of course, a number of other two-way transaction cases, like *Peterkin*, that found sufficient evidence for probable cause. For example, in *Tobias, supra*, 375 A.2d 491, experienced officers in a high narcotics area observed the appellant make two separate exchanges of small objects for currency. They arrested the appellant after he took out another small object and approached a third group of men, although he placed that object back in his bag and began running away upon seeing the officers behind him. This court pointed to several factors in upholding the finding of probable cause: 1) officers observed appellant exchange small items for currency; 2) there were experienced officers in a high drug area; and, 3) appellant attempted to conceal the third small object and ran upon seeing the police. "Even though there might have been innocent explanations for appellant's conduct, it is not necessary that all innocent explanations for a person's actions be absent before those actions can provide probable cause for an arrest." *Id.* at 494.

Another such case is *Thompson, supra*, 745 A.2d 308. In that case, experienced officers were on surveillance in a high drug area observing a third person, Lathan, sitting on his porch in the middle of the winter for over twenty minutes. After appellant Thompson pulled up in his car and both men went into an alley, officers saw Lathan reach down and hand appellant a small object in return for some currency. After a lookout was broadcast, officers stopped appellant's car and arrested appellant a short distance away while he was handing a small object to his passenger in the car. The court found probable cause to arrest appellant based on several factors: 1) a completed two-way

exchange between appellant and Lathan, supported by the fact that Lathan was acting in a manner consistent with a drug transaction; 2) officers observing Lathan engage in other drug transactions that same night (i.e., second person involved in the transaction is known to be involved in illegal activity); 3) it was a high drug area with experienced officers; and, 4) appellant handing an object to his passenger when officers approached.

On the other side of the scale are cases that involved observation of what might be called only one side of a possible drug transaction, which appellant uses to argue that the pending case, like these other cases, lacks probable cause. For example, *Duhart v. United States*, 589 A.2d 895 (D.C.1991), involved a police officer who stopped the appellant after he observed appellant display "something" to another man in a high drug area. Noting that the officer did not observe even a one-way transfer of money or an object resembling drugs, we held that there was not sufficient evidence to find reasonable suspicion for a *Terry* stop. Although we recognize that there is a greater burden in demonstrating probable cause than is required for a *Terry* stop, the facts of *Duhart* are far short of those before us, e.g.: 1) there was no information regarding the second person involved in the incident; 2) there was no evidence of any currency or other medium of exchange in the second person's possession; and, 3) the officer had no basis for determining what the "something" in appellant's hand was. The officer's hunch that a drug transaction was about to take place simply because he saw "something" in appellant's hand was not enough.

Similarly, in *Waters v. United States*, 311 A.2d 835 (D.C.1973), the appellant was seized after an officer observed appellant stuffing money into an envelope while a known drug user approached him. The court held that there was no probable cause to seize the appellant. Unlike the case before us, 1) there was no indication that the officer was experienced in drug related arrests or that the location of the incident was a high drug area; 2) the officer gave no indication that appellant, although he was putting currency in an envelope, was necessarily acting in a manner associated with drug dealing or any other type of transaction with another person; and, 3) the second person involved in the incident was not displaying currency, drugs, or any other item suggesting a transaction.

Yet another such case is *In re T.T.C.*, 583 A.2d 986 (D.C.1990). There, the officers observed one man hand a small white object to another man and then get into a car with appellant, who was sitting in the rear passenger seat. Shortly thereafter, officers stopped the car and subsequently arrested appellant after finding a ziplock bag containing a rock like substance on the car floor near where appellant was seated. This court reversed, holding that there was not even reasonable suspicion to perform a *Terry* stop:

> Appellant was 'seized' by the police officer based on suspicions arising entirely from [the officer's] earlier observation of another passenger transferring a small, white object to a person on a street corner that was known for high-drug activity. Yet all that [the officer] saw was one man pass another man a small white object on a corner known for drug trafficking. The object may have been illegal drugs or any number of other things.

*Id.* at 990.

The bottom line, then, is that the present case is different from those cited to us by appellant precisely because of the factors present here that support the finding of probable cause. Cases such as *Duhart*, *Waters*, and *T.T.C.* do not have the num-

ber of relevant factors that are present here. And although there was not a completed two-way transaction here as in *Peterkin, Tobias,* and *Thompson,* we have enough facts to suggest that this was an interrupted drug transaction, and therefore tips toward the two-way transaction cases. Given all the circumstances, we affirm the trial court's denial of appellant's motion to suppress relating to the November 3 incident.

### B. November 8, 1997

As presented to us, the controlling issue with respect to the November 8 stop is when appellant was "seized" for purposes of the Fourth Amendment. Appellant contends that the trial court erred in its position that police officers seized appellant only after the woman said that everything was "okay". And if the seizure actually occurred prior to the woman's comment, then appellant argues that there was no articulable suspicion under *Terry* to stop him at that time. He asserts that the failure by the government to identify the source of the information that led to the radio run broadcast falls afoul of the recent Supreme Court opinion holding that an anonymous tip cannot suffice to provide the basis for a *Terry* stop. *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *see also Sanders, supra,* 751 A.2d 952.

▇▇▇▇ The government does not attempt to justify the stop if it is held to have occurred prior to the time when the woman made the statement. Rather, it asserts that the trial court was correct in positing that the stop did not occur until after the statement was made. This is an issue of law. *United States v. Allen,* 436 A.2d 1303, 1308 (D.C.1981). We think on the

record here, insofar as it was developed by the government,[5] the appellant is correct in arguing that the stop occurred prior to the woman's statement. Given the apparent concession of the government that the *Terry* stop had not been shown to be justified at that point,[6] we reverse the denial of the motion to suppress relating to the November 8 incident.

▇▇▇▇ For Fourth Amendment purposes, a seizure occurs when "in view of all of the circumstances surrounding the incident a reasonable person would have believed that he was not free to leave[,]" *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), although "a seizure does not occur in the absence of an application of physical force unless the subject actually yields[,]" *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). *See Green v. United States,* 662 A.2d 1388, 1390 (D.C.1995). A seizure is in contrast to a consensual encounter, such as when an officer merely approaches an individual on the street and asks him if he is willing to answer some questions. *See Anderson v. United States,* 658 A.2d 1036, 1040 (D.C. 1995). But "other circumstances, such as the physical touching of the suspect, display of a weapon, the use of language or tone of voice indicating compulsion may turn a consensual encounter into a seizure." *Duhart, supra,* 589 A.2d at 897–98.

▇▇▇▇ We turn to the facts of this case. Here, the officers were "coming in" to the location of the reported assault under "Code 1 status." They were in a marked police car with flashing lights on and the siren sounding. They spotted appellant one block away from the location of the

---

5. The government has the burden of proving that the stop was constitutionally permissible. *Upshur v. United States,* 716 A.2d 981, 983 n. 3 (D.C.1998).

6. We therefore do not explore that possibility. *Rose v. United States,* 629 A.2d 526, 535–36 & n. 19 (D.C.1993).

assault and drove up to him. One of the officers got out of the car and asked appellant to "come over." Was this a consensual encounter or a seizure at that point?

This court has not spoken at any length about the value, as a factor in the seizure analysis, of a police car's lights and sirens being activated. However, in *Lawrence v. United States*, 509 A.2d 614 (D.C.1986), this court briefly discussed the effect of a patrol car's emergency equipment, such as sirens and flashing lights, to a pedestrian. In *Lawrence*, we noted that "there is a critical difference between an officer's turning his vehicle's flashing lights on to signal a motorist to stop and turning on emergency equipment to stop a pedestrian." *Id.* at 616 n. 2. While a seizure does occur when a police officer signals a motorist to stop by use of a siren or red light, "[a] pedestrian ... who notices a patrol wagon's emergency equipment ordinarily is not likely to know that an officer is signaling for a stop until the officer communicates in a more direct manner to the pedestrian the officer's intention to stop the pedestrian." *Id.* This suggests that something beyond flashing lights and blaring sirens is necessary in order for the actions of the officers to constitute the seizure of a pedestrian.

In this case, we have that additional component. Here, not only did the officers drive right up to appellant with the lights on and siren running, but Officer Carter testified that "[w]hen we got to the location, I got out of the car, and then I asked Mr. Davis to come over to the car." We have no reason to believe that appellant did not begin to acquiesce to this instruction prior to the woman's comment. As noted above, the burden was on the government to justify the *Terry* stop. We do not think that a reasonable person in that situation would have felt free to leave or decline to comply. On the record here, the motion to suppress the evidence relat-

ing to the November 8 incident should have been granted.

Accordingly, we affirm the conviction for the November 3 incident but reverse the conviction for the November 8 incident, and remand for further proceedings consistent with this opinion.

*So ordered.*