Ronald YOUNG, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CO–382.

District of Columbia Court of Appeals.

Argued April 5, 2011.

Decided Dec. 13, 2012.

As Amended Jan. 10, 2013.

Alice Wang, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Margaret A. Chriss, and Edward A. O'Connell, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON, Associate Judge, and BELSON * and RUIZ,** Senior Judges.

RUIZ, Senior Judge:

In December 2003, a jury found appellant guilty of unlawful distribution of a controlled substance (heroin), in violation of D.C.Code § 48–904.01(a)(1) (2001).[1] In

---

* Senior Judge Belson replaced Judge Kramer on the division after her retirement on May 1, 2011.

** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

1. Appellant was sentenced to twenty-seven

2006, appellant filed, through current counsel, a motion to vacate his sentence under D.C.Code § 23–110, alleging that his trial counsel had rendered constitutionally ineffective representation. After a hearing held in 2008, the trial court denied appellant's motion in 2009. This appeal followed. Appellant argues that the trial court erred in denying his motion and should have granted him a new trial because trial counsel failed to file a motion to suppress physical and identification evidence that was obtained pursuant to an illegal search and seizure, and failed to properly investigate the facts by consulting with a narcotics expert, which would have led him to present expert testimony at trial that would have called the government's witnesses' testimony into substantial doubt. We do not find merit in appellant's contention that counsel was constitutionally ineffective for failing to file a motion to suppress. We conclude, however, that trial counsel's failure to consult with a narcotics expert before trial and present expert testimony at trial fell below the norm of reasonable professional standards and that this deficiency prejudiced the defense. Therefore, we reverse and remand for a new trial.

## I. Facts

Metropolitan Police Department (MPD) Officers Adrian Johnson and Angelo Battle were working undercover as part of a "buy/bust" operation near the 5100 block of Nannie Helen Burroughs Avenue in Northeast Washington, DC on August 21, 2003. Several other officers were also in the vicinity working as the operation's "arrest team." At approximately 4:45 p.m., Officers Johnson and Battle parked their unmarked car in front of a carryout restaurant at 5120 Nannie Helen Burroughs Avenue to buy a meal. While eating in their car, Officers Johnson and Battle observed a man, later identified as appellant, exit a Mercedes Benz SUV parked across the street, walk across the street, and talk with another man, later identified as Willie Knox.

As appellant and Knox talked, they walked into the same carryout restaurant where the officers had just purchased their meal. Officer Johnson returned to the restaurant to get some ketchup. While inside the restaurant, a small establishment with windows on three sides and just a countertop where orders are placed (no tables or seating), Officer Johnson overheard appellant and Knox's conversation: Appellant asked Knox, "how much you have?" Knox responded, "I got you baby ... I got about 50 on me." Appellant replied, "yeah, it's going to cost—it's going to be—it's going to cost you at least 50." Officer Johnson then saw Knox count currency and hand it to appellant, and appellant pass an object "small enough to be concealed with a closed hand" to Knox. After the exchange, appellant left the restaurant and "just casually just strolled up the sidewalk" to a bus stop at the end of the block.

Officer Battle, who was still in the car, also observed the transaction through the restaurant's window. Battle saw appellant pass a "brown-colored object" to Knox. As soon as Officer Johnson returned to the vehicle, Officer Battle asked him, "[W]as that—was that a drug deal? Did they just do a transact—a hand-to-hand?" After Johnson confirmed, "[Y]eah, [t]hey did a hand-to-hand," Battle issued a broadcast lookout, describing appellant and Knox to the nearby arrest team and instructing them to "move in." In the lookout he described appellant as wearing blue jeans

years of incarceration, with fifteen of the twenty-seven years suspended, five years of supervised release suspended, two years of supervised probation, and $100 assessed under the Victims of Violent Crime Compensation Act of 1996.

and a black shirt. The arrest team arrived within one minute and stopped appellant at the bus stop approximately thirty feet from the entrance to the carryout restaurant.

As appellant was being stopped, Officer Battle communicated over the radio that another officer needed to go inside the restaurant to stop Knox. Officer Battle saw Knox begin to leave the restaurant, only to immediately go back inside once he saw appellant being approached by the officers at the bus stop. Battle then saw Knox "toss[ ] a brown item to the floor of the carry-out," which he also said he "believe[d] was a brown paper bag item." Other officers arrived at the restaurant and stopped Knox. The officers found a "piece of brown-paper" with ten pink ziplock bags "less than two feet" from where Knox had been standing. White powder inside each of the ten bags field-tested positive for opiates. DEA technicians later tested the substance, and found it to be 28% pure heroin with a reserve weight of 0.87 grams.

Officers Battle and Johnson confirmed for the arrest team that appellant and Knox were the same two men they had just observed in the carryout restaurant. The officers arrested both men and took a photograph of appellant in his blue jeans and black shirt.

Appellant took the stand in his defense. He denied getting out of a Mercedes Benz SUV, entering the carryout restaurant, and meeting with Knox and passing anything to him. Appellant testified that he had walked to the Nannie Helen Burroughs area and that he had been standing at the bus stop conversing "for a while" with his friends Lizzy Stoddard and John Brand when the officers arrived and "grab[bed] Mr. Knox" at the carryout restaurant. Stoddard and Brand corroborated appellant's recounting of events, testifying that they had been with appellant conversing at the bus stop for about twenty minutes before the officers stopped him. Brand and Stoddard testified they had not seen appellant go into the carryout restaurant from the time they arrived at the bus-stop until the officers arrested appellant. As to the sequence, Stoddard and Brand confirmed that officers stopped Knox first at the carryout restaurant, and then stopped and searched appellant at the bus stop.

There was no forensic evidence linking appellant to the drugs seized in the carryout restaurant. Officers searched appellant and found $72 and some personal items, but no drugs or drug paraphernalia.

## II. Ineffective Assistance of Counsel

 In reviewing the denial of an ineffective assistance of counsel claim, we defer to the trial court's findings of fact unless they lack support in the record, but we review the trial court's conclusions of law *de novo*. *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C.2007) (en banc). The applicable law with respect to ineffective assistance of counsel is well settled:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## A. Failure to File a Motion to Suppress

In the § 23–110 motion, appellant argued that his trial counsel should have filed a motion to suppress (i) the $72 found on him, (ii) the identification of him made by Officers Battle and Johnson after appellant was stopped by the arrest team, and (iii) the photograph of him taken at the time of his arrest. He argued that the officers lacked probable cause to arrest and search him, and that a motion to suppress the products of an unlawful search would likely have been granted. The failure to file such a motion, argued appellant, prejudiced him at trial, rendering trial counsel constitutionally ineffective.

At the § 23–110 hearing, the government called appellant's trial counsel, Greg Baron, as a witness. Baron testified that he had considered and researched the possibility of filing a motion to suppress, but concluded that such a motion would not be meritorious. Appellant did not present any evidence. The court found that the arrest and search were supported by probable cause, and that a suppression motion, therefore, would not have been granted.[2] In a two-step analysis the court found, first, that under the totality of the circumstances, the officers were justified in detaining appellant at the bus stop because they believed the transaction they observed involved drugs. *See Terry v. Ohio,* 392 U.S. 1, 26–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that police officers having reasonable articulable suspicion that criminal activity is underway may conduct a limited "stop and frisk" without violating the Fourth Amendment rights of the person stopped). Second, that after appellant had been stopped, Knox's throwing of the drugs on the floor of the carryout sufficed to establish probable cause to justify an arrest and a search incident to arrest for suspected drug dealing. *See Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (an arrest must be supported by probable cause to comport with the arrestee's Fourth Amendment rights). Appellant does not challenge the *Terry* stop; he

2. Specifically, the court found:

The evidentiary trial record reflected in this case that before the exchange occurred, the officers observed [appellant] and [Knox] leave the openness of a parking lot and street for the privacy of the empty carryout. Thereafter, Metropolitan Police Department Officer Johnson entered the carryout and overheard [appellant] and [Knox] negotiating a price. Officer Johnson then saw [Knox] count out currency and observed the exchange of the money for a small item. Officer Battle witnessed the exchange as well, through an unobstructed view of [appellant and Knox] inside the carryout, while he remained located in a car in a lot. This exchange occurred inside a carryout located in a neighborhood that Officer Johnson characterized as an open air drug market for illegal drugs. . . .

When [appellant] left the carryout, Officer Johnson returned to his unmarked police car where Officer Battle broadcasted a description of [appellant] and [Knox] and directed that they "be stopped." Approximately twenty to thirty seconds later, members of the arrest team stopped [appellant]. The record further reflects that as [appellant] was being stopped, the undercover officers saw [Knox] looking out of the door at the arrest team. [Knox] then turned and immediately went back into the carryout. Officer Johnson saw [Knox] make a throwing motion, while Officer Battle observed him throw a small, brown item to the floor. The officers recovered the thrown item, within two feet of [Knox], which contained ten zip locks that field-tested positive for opiates.

Under the totality of the circumstances, it is clear that the officers were justified in briefly detaining [appellant] who they believed to be involved in a drug transaction. Once probable cause was established, the police had authority to search [appellant] incident to arrest.

disputes only that probable cause existed at the time he was arrested.

■■■■ The existence of probable cause is tested by asking "whether a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience, would be warranted in the belief that an offense has been or is being committed." *Davis v. United States,* 781 A.2d 729, 734 (D.C.2001). " 'The analysis must be guided by practical rather than technical considerations keeping in mind the necessities of the moment and the reasonableness of the officers' actions.' " *Id.* (quoting *Peterkin v. United States,* 281 A.2d 567, 568 (D.C.1971)). Specifically, in the case of "two-way" exchanges of an object for money in high-crime areas, " 'the real key ... is how the observed transaction fits into the totality of the circumstances.' " *Jefferson v. United States,* 906 A.2d 885, 888 (D.C.2006) (quoting *Davis,* 781 A.2d at 737).

Appellant relies on our analysis in *Shelton v. United States,* 929 A.2d 420, 423 (D.C.2007), to support his argument that a motion to suppress would have been successful. In *Shelton,* two undercover officers were working as part of a buy/bust operation, driving in an unmarked police cruiser. *Id.* at 422. The officers were driving to a targeted area known for heavy narcotics activity. *Id.* On the way, the officers pulled their vehicle directly behind another car, into the parking lot of a convenience store. *Id.* The officers observed someone approach the other car with money in his hand and talk to the driver. *Id.* The two then made a hand-to-hand exchange. *Id.* The person who had approached the car gave money, and, in exchange, the driver gave a small object. *Id.* The undercover officers called in an arrest team that later stopped the vehicle, arrested the driver and, in a search of the driver incident to arrest, discovered crack cocaine in his left sock. *Id.* The driver was charged with drug possession, and his pretrial motion to suppress the crack cocaine found when he was searched was denied. *Id.*

On appeal, we held that the trial court erred in denying the suppression motion because the officers had no probable cause to arrest and search the driver. *Id.* at 423. We first acknowledged the various factors that would have given the officers reason to believe that they had witnessed a drug sale:

> appellant sitting in a car in a convenience store parking lot, (2) a pedestrian holding currency approach[ing] appellant's driver's side window and giv[ing] that money to appellant, (3) the pedestrian receiv[ing] back from appellant some kind of "small object," and (4) both parties depart[ing] the scene.

*Id.* at 424. We noted in *Shelton* that notwithstanding the officers' observation of an apparent two-way exchange, there was no evidence of additional facts that had been relied upon in other "two-way transaction" cases to sustain probable cause that the exchange involved drugs, including: the suspect was seen passing something taken out of a "plastic medicine vial," *id.* (citing *Peterkin,* 281 A.2d at 567–68); the suspect tried to conceal the object he was receiving and fled upon seeing the police, *id.* at 425 (citing *Tobias v. United States,* 375 A.2d 491, 494 (D.C.1977)); the suspect was seen purchasing "a zipper-seal plastic bag 'which [the seller] retrieved from an apparent stash in a nearby tree-box space,' " *id.* (quoting *Coles v. United States,* 682 A.2d 167, 168 (D.C.1996)); the police had seen the suspect approach a different vehicle "in the same suspicious manner" before ultimately making a purchase from the occupant of a second vehicle. *Id.* (quoting *Davis,* 781 A.2d at 735–36).

The government's probable cause argument in *Shelton* included an assertion that the transaction had occurred in a "high drug area," which justified the arrest. The record, however, showed only that the officers were on their way to a high drug area, and that where they parked was near, rather than in, this area. *See id.* at 427 ("Where the government is placing such heavy reliance on the fact that the place where the suspected transaction took place was a 'high drug area,' that fact must be shown with sufficient particularity to justify such reliance."). Moreover, we observed that even though the occurrence of a transaction in a high drug area can be relevant to the probable cause analysis, it " 'does not objectively lend any sinister connotation to facts that are innocent on their face.' " *Id.* at 426 (quoting *Smith v. United States*, 558 A.2d 312, 316 (D.C. 1989) (en banc)) (" '[T]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct.' " (quoting *In re D.J.*, 532 A.2d 138, 143 (D.C. 1987))); *see also In re D.J.*, 532 A.2d at 143 ("Thousands of persons live and go about their legitimate business in areas which are denoted 'high crime areas' by police. Innocent activities do not become sinister by the mere fact that they take place in one of these areas.").

Considering the situation as a whole, we concluded in *Shelton* that there were not enough relevant facts to support probable cause to arrest:

> [T]he instant case involves a two-way transaction on a record otherwise devoid of suspicious circumstances and where the observed transaction is capable of numerous innocent explanations. [The officer] observed the transaction immediately upon entering the parking lot

and received no insight from events occurring before the transaction. [The officer] did not know or recognize either of the subjects as participants in past criminal activity. [The officer] did not see appellant retrieve the "small object" from a suspicious container or location. And immediately after the transaction, appellant and the pedestrian left the scene and [the officer] ordered appellant's arrest; no conduct subsequent to the transaction—such as any attempt to flee or conceal contraband—entered into the probable cause analysis.

*Shelton*, 929 A.2d at 425–26. Because the defendant's conviction relied largely upon the crack cocaine seized at the time of arrest and admitted at his trial, we reversed the conviction.

■ In this case, appellant highlights facts that are missing from the undercover officers' observations before they arrested him that are similar to the missing facts in *Shelton*: appellant was never seen attempting to flee, neither of the officers observed any attribute of the small brown object that would have identified it as contraband,[3] no part of appellant's conversation with Knox mentioned drugs, the carryout restaurant itself was not known to be a high-drug area, the officers did not recognize appellant from past drug transactions, and appellant did not attempt to stash or conceal any contraband. Thus, appellant argues, there are none of the additional "suspicious circumstances" mentioned in *Shelton* that would convert the facially innocent hand-to-hand exchange observed by the officers into the kind of suspicious transaction that would support probable cause for an arrest.

The government, on the other hand, distinguishes this case from *Shelton*. Importantly, argues the government, the specific

---

**3.** Indeed, at trial, Officer Johnson testified, "I know something was passed. I just couldn't make out what it was."

block of Nannie Helen Burroughs Avenue where appellant was arrested was known as an area "where a lot of heroin [is] bought and sold." According to Officer Johnson, who was "very familiar" with that area and who had made a number of undercover purchases there in the past, it was an "open-air, I really mean open-air drug market. High intensity drug-selling activity goes on in that area." Additionally, he testified, the area was known for heroin sales in particular, and that these sales were known to occur primarily in the early morning and in the late afternoon (the sale here took place at approximately 4:45 p.m.). The government argues that unlike in *Shelton,* where the transaction was conducted in a parking lot on the way to the high drug area, here although the officers had parked in front of the carryout to get food, they had been specifically targeting the 5100 block of Nannie Helen Burroughs Avenue where the carryout restaurant was located, next to a methadone clinic.

The government also points to additional facts that added to the officers' suspicions. Appellant and Knox first met on the street, and then walked into the restaurant together; once in the restaurant, they did not buy anything to eat, but instead carried on their conversation and made their exchange. Once undercover Officer Johnson entered the restaurant, appellant and Knox looked up, paused in their conversation, and then resumed once Johnson began to engage with the attendant at the ordering window. This interruption in their conversation could have suggested to the officer that appellant and Knox were concerned about being overheard. Then, Officer Johnson heard appellant and Knox mention $50, and saw a small object being passed between the two men. While there are admittedly many small objects with a $50 value, a quantity of drugs was one of the more obvious possibilities, according to the government, at such a location. And,

notably absent from the conversation, says the government, was any information suggesting that the item for sale was something innocuous. Appellant left the restaurant as soon as the exchange concluded, and Knox attempted to leave less than a minute later only to retreat into the carryout restaurant upon seeing the police approach appellant at the bus stop.

A very significant fact in the probable cause analysis in this case is the small brown paper item, later determined to contain heroin, that the officers saw Knox toss to the floor of the carryout. The trial court found that Officers Battle and Johnson saw Knox begin to leave the restaurant and look toward the bus stop "as [appellant] was being stopped," and that "[Knox] then turned and immediately went back into the carryout" and threw the item onto the *floor*—with the implication that Knox discarded the item and the officers retrieved it *before* appellant was arrested. Appellant disputes this sequence of events, arguing that "[t]he record makes clear that [appellant] was arrested and searched as soon as Officer Battle positively identified him as the person involved in the suspected drug deal, and that Mr. Knox made the 'tossing motion' only [afterwards]." The government, citing the combined testimony of the various witnesses, asserts that the evidence supports that events unfolded in the sequence described in the court's order: "Knox tossed drugs as the officers were starting to stop appellant, and that appellant was searched thereafter."

In our view, the sequence of events is critical. If Officer Battle saw Knox retreat into the restaurant and toss the brown paper to the floor once he noticed police officers approaching appellant at the bus stop, the arresting officer could suspect (under a collective knowledge theory) that the item Knox tossed was the one he had received from appellant and that Knox

tried to get rid of it upon seeing the officers because he knew it contained drugs. The fact that officers saw Knox discard the package after they stopped appellant but before they arrested him, distinguishes this case from *Shelton*, and is a significant fact in the totality of the circumstances that supports probable cause. *See United States v. Jackson*, 360 F.Supp.2d 24, 27 (D.D.C.2003) (probable cause supported by fact that suspect, while fleeing from police, threw clear plastic bag which appeared to contain drugs over a fence); *United States v. McFadden*, 722 F.Supp. 807, 810 (D.D.C.1989) (probable cause supported by the fact that suspect, while fleeing from police, threw a brown paper bag thought to contain drugs onto a rooftop).

The officers' testimony,[4] and the inferences reasonably drawn from it, support the trial court's findings that as appellant was being stopped, Knox looked up and, upon seeing other officers arrive just outside the windowed restaurant, immediately retreated into the restaurant and discarded the brown paper in his possession. The officers retrieved the paper with its ten ziplock bags. Once both suspects had been stopped and Officers Battle and

Johnson identified them as the participants of the exchange, they were placed under arrest. Even though the record is not crystal-clear on some points of this sequence, we do not think the trial court's findings in the order denying the § 23–110 motion as to the sequence of events were clearly erroneous.

▮ To succeed on an ineffectiveness claim grounded on counsel's failure to file a suppression motion, it is the movant's burden to show that a Fourth Amendment claim would have been successful. *See Wright v. United States*, 608 A.2d 763, 765 (D.C.1992). Significantly, "[the burden of establishing prejudice] is particularly demanding when the claim is, as here, based on counsel's failure to file a suppression motion." *Id.* "In such circumstances, the movant must be prepared to introduce 'whatever evidence will be necessary to succeed with suppression.'" *Id.* (quoting *Hockman v. United States*, 517 A.2d 44, 50 n. 9 (D.C.1986)). As appellant did not present evidence at the § 23–110 hearing to support his version of events or discredit the sequence suggested by the testimony of the officers at trial, he has not shouldered his burden to show prejudice.[5] *See*

4. Officer Johnson testified at trial that members of the arrest team stopped Knox between "[t]wo and five seconds" after stopping appellant. Officer Battle testified that "Mr. Knox was in transition of exiting the carry-out as the arrest team pulled up. Mr. Knox was looking in the direction of the arrest team, simultaneously ... making a U-turn ... back into the carry-out and tossed a brown ... what I believe was a brown paper bag item to the floor." According to Officer Ronald Royster, the officer who stopped appellant, "I pulled up, [Officers Battle and Johnson] advised me that when [Knox] saw us pulling up he ran back inside the carryout and tossed something to the ground." Officer Royster further testified that, "[a]s I drove up in the car, in the block, I observed [appellant] standing behind the bus stop, exited the vehicle, walked over to [appellant] and stopped him, at which time the officers in the observation

post, a short time after we stopped him, advised us that that was the correct subject." According to Officer Royster, appellant was stopped very quickly after the lookout was broadcast ("[a] few seconds. I would say less than a minute, maybe a little over a minute."), but wasn't arrested until "a few minutes" after the broadcast.

5. Had a suppression motion been filed before trial or the record supplemented at the § 23–110 hearing, there could have been more factual development and the trial court could have made more precise factual findings with respect to the order in which the various events unfolded. Specifically, the question of exactly when Knox tossed the bag and when the officers seized it and its contents in relation to appellant's arrest presumably could have been clarified. But appellant presented no evidence at the § 23–110 hearing to sup-

*Lowery v. United States*, 3 A.3d 1169, 1173–74 (D.C.2010) (" 'The import of a silent record depends on which party bears the burden of production and persuasion on this question.' " (quoting *United States v. Williams*, 559 F.3d 607, 611 (7th Cir. 2009))). Moreover, " 'we must give deference to the trial court's findings of fact as to the *circumstances* surrounding the appellant's encounter with the police and uphold them unless they are clearly erroneous.' " *Shelton*, 929 A.2d at 423 (quoting *Prince v. United States*, 825 A.2d 928, 931 (D.C.2003)). In denying the § 23–110 motion, the trial court credited the officers' trial testimony that supports appellant was not arrested until after Knox tossed the bag. In light of the totality of the evidence, including the sequence of events found by the trial court, which was not clearly erroneous, there was probable cause to arrest appellant. Because appellant's arrest and subsequent search were supported by probable cause, a motion to suppress the $72, the officers' identification, and photograph on Fourth Amendment grounds would not have been meritorious. Thus, the trial court did not err in denying appellant's § 23–110 motion claiming that his counsel was ineffective for failing to file a motion to suppress. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffec-

tiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.").

## B. Failure to Consult a Narcotics Expert

We come to a different conclusion with respect to appellant's claim that his trial counsel was insufficiently prepared for trial and, as a result, did not call an expert on narcotics who would have questioned the officers' accounts of what they observed. As the government's case rested on the officers' testimony, and there is a reasonable probability of a different outcome if an expert witness had been presented, we reverse and remand for a new trial.

### 1. The § 23–110 Motion and Hearing

The officers testified at trial that the police recovered a small brown paper bag from the floor of the carryout that contained ten ziplocks, with approximately 0.87 grams of 28% pure heroin. The government's theory was that the brown paper bag was the "small brown object" that the officers said they saw appellant exchange for Knox's $50. In his § 23–110 motion, appellant argued that trial counsel was constitutionally ineffective for not pre-

plement the trial testimony of the officers, see note 4 *supra*, given at a time when probable cause to arrest had not been raised as an issue.

Appellant's alternative interpretation of the sequence of events rests entirely upon a statement by Officer Battle at trial that, upon seeing appellant being stopped, he "immediately picked that radio back up and said okay, look[s] like ya'll got him. That's positive." Appellant argues we should infer from this statement that Officer Royster placed appellant under arrest and searched him immedi-

ately after Officer Battle's identification. It appears from the record that Officers Johnson and Battle formally identified appellant and Knox together after they had both been stopped, and the trial court found that it was only after their joint identification—and after Knox's toss—that appellant was arrested. We also note that the version of events that appellant argued in his § 23–110 motion and on appeal is at odds with appellant's own testimony at trial, where he testified that the officers seized the drugs in the carryout restaurant before they arrested him. ·

senting a narcotics expert witness at trial to challenge the officers' accounts of the transaction they said they observed, which were the centerpiece of the government's case. Specifically, appellant contends that counsel should have investigated whether the $50 Knox gave to appellant in the carryout restaurant was consistent with the quantity and purity of drugs recovered from the floor of the restaurant, and whether the transaction the officers described was plausible as a drug sale in that area.

Together with his § 23–110 motion, appellant submitted affidavits from former MPD Detectives Mark Stone and Myron Smith, both of whom served as Resident Narcotics Experts in Superior Court. Detectives Stone and Smith opined that, based on weight and purity,[6] each one of the ten ziplock bags the officers seized in the carryout restaurant would have sold on the street for $20 in August 2003, making the total value of the heroin ($200) four times as much as the $50 price that Officer Johnson overheard in the negotiation between Knox and appellant. According to Detective Stone, "the recovery of ten bags of heroin with the weight and purity in this case would be inconsistent with a transaction involving $50." Detective Stone also questioned that the drugs found would have corresponded to a transaction between a dealer and a reseller stating that, "[i]f a ten-pack of heroin were transferred to an intermediary for subsequent sale, it would typically include two extra bags that the intermediary could keep or sell for himself as payment for selling the other bags."[7] Detective Smith opined that "[t]he amount of heroin purchased in a

typical street-level transaction is one to three zip-lock bags. For a drug dealer to sell a 'ten-pack' ... is outside the norm." Detective Stone agreed that "a user would not buy ten bags of heroin in a single transaction" because "heroin varies widely in quality and toxicity" and "it would be very risky for a user to buy more than a few bags at a time." Detective Smith also opined that the carryout restaurant is the "type of establishment [that] naturally serves as a 'stash' location where drugs are stored or secreted."

The government, in its opposition, submitted the affidavit of MPD Detective Anthony Washington, who also served as Resident Narcotics Expert in Superior Court. Detective Washington did not dispute that the proper valuation of the drugs was $200. He opined, however, that "sometimes" a drug dealer will sell a quantity of drugs at less than full price, expecting a trusted reseller with whom the dealer has "engaged in transactions before" to pay the remaining purchase price once the drugs were resold. Alternatively, Detective Washington's affidavit suggested, the ten ziplocks could have been a "tester"—"a small supply of drugs from a new source that a dealer will give or offer at a reduced price to a re-seller," who would then sell the drugs and report back to the dealer on how well the drugs were received by users on the street. Detective Washington noted that "[t]he high purity of the heroin in this case indicates that it might have come from a new source and that the ten-pack transferred by the defendant to the codefendant might have been a tester." Like Detective Smith, Detective Washington

---

6. Detective Stone opined that the purity (28%) of the heroin recovered from the carryout floor was twice to four times higher than "[t]he average purity of the heroin sold in this area [which] is 7% to 14%."

7. As Detective Stone explained at the hearing, "[t]hese ten packs are actually more than ten and so they could either be 12 or 13. The payment for selling the ten bringing back the money to the seller is giving the person the opportunity to either use or sell the extra bags."

thought it would not be "uncommon to use a commercial establishment, such as a carry out to stash drugs," but he did not think they would be stashed "in plain view" such as on the floor.

At the § 23–110 hearing, Detective Stone rebutted the possible explanations offered in Detective Washington's affidavit. Detective Stone testified that he did not think it was very likely that appellant would have "fronted" Knox the ten bags of heroin for $50 in the exchange overheard by Officer Battle because these transactions are usually negotiated in advance, and the entire quantity of drugs is fronted without any prepayment. He added that an exchange of drugs would have been negotiated beforehand "[b]ecause of police that might be in the area." Detective Stone questioned the "partial payment" theory suggested by Detective Washington, because drug-dealers in the Nannie Helen Burroughs area are a close-knit group of veteran dealers, making it unlikely that a dealer would require payment up front, or risk negotiating a drug sale in public or in the presence of strangers.[8] Detective Stone testified, "these are people who are veterans of the neighborhood, and have dealt with these various sellers before, or are people who lived in the neighborhood for a while, they know who they are, they know where they live ... so there is a risk of being shot or beat up if [the promise to bring back money for the drugs is not carried out]."

Detective Stone also thought that the government's proffered "tester" scenario was unlikely. According to Detective Stone, a tester of heroin typically contains "[r]oughly anywhere between 10 to 20 milligrams ... [n]ot 110 milligrams" (the amount per bag found on the carryout floor), testers are not sold for money, and the testing phase usually occurs while the heroin is being cut and diluted, rather than after it has been cut and bagged.[9] Detective Stone testified that testing occurs "[d]uring the cutting, the diluting process" [10] and "[t]esters especially with heroin are usually done in [a] house, in some location, less of a location, maybe in a car, but mostly it is done inside an apartment building or some residence."

In cross-examining Detective Stone, the government elicited that the Nannie Helen Burroughs area was known for heroin sales that typically occurred in the early morning and late afternoon, and that the area was a "very crowded" "open air drug market." Detective Stone acknowledged that "there is no one way to do a drug deal" and that there is so much variation in the way drugs are sold that the best any experts can do is to generalize. Detective Stone further acknowledged that the usual manner in which drugs are sold could be affected by, among other things, a debt owed by the reseller to a supplier, one party's immediate need for cash, a friendship between the two parties to the transaction, or one party's misunderstanding of the value of drugs being bought or sold.

---

**8.** In response to the query, "how likely would it be for a dealer in this neighborhood to bargain for the price of a ten pack inside a carry out restaurant in front of someone he didn't know," Detective Stone stated, "I think it would be unlikely ... if a restaurant had a lot of people in it, but one person in it who does not live in the neighborhood, who is a stranger to that particular area, just to openly carry out that conversation, I think it would be unlikely."

**9.** Detective Stone testified that a dealer would "[n]ot [give] 110 milligrams to test" and the tester would not be packaged in a ten-pack because "once it is wrapped in a ten pack it is all ready to go. It has already been tested."

**10.** The diluting process involves decreasing the purity of heroin. As the heroin recovered was 28% pure—very concentrated—it does not appear to have been diluted, a fact that also cuts against Detective Washington's tester hypothesis.

The government did not present its expert, Detective Washington, as a witness at the § 23–110 hearing. The government called Greg Baron, appellant's trial counsel, as a witness. Baron's testimony on direct examination concerned matters other than his failure to consult with a narcotics expert. On cross-examination, Baron testified that he was unfamiliar with the street value of the heroin in the ziplock bags seized in the carryout restaurant. It had not occurred to him when preparing appellant's defense that there could be an inconsistency between the officers' account of the amount of money they said they overheard was being exchanged for the brown object and the quantity and purity of heroin found on the floor of the carryout restaurant.[11] Baron acknowledged that he had been informed by the government before trial that the government intended to call one of three drug experts (Detectives Mark Stone, Anthony Washington, and Angelo Hicks) at trial, and that they were available to be interviewed by the defense. Baron considered this to be "boilerplate," however that was not necessarily indicative of the government's actual intention to call a narcotics expert.[12] Baron said he had tried approximately 100 drug cases, and his experience was that the testimony of narcotics experts was rarely of any use

to the defense. He testified, however, that he could have discussed with a drug expert the purity and price of drugs recovered in this case.[13] Baron testified that he probably would have called an expert witness in appellant's trial had he known that the value of the heroin recovered in the carry-out restaurant greatly exceeded the $50 in the transaction the officers described, and that, relying on the expert's testimony, he would have argued that the jury should doubt the officers' testimony. In essence, Baron conceded that he should have consulted a drug expert.

The trial court concluded that appellant had not shown either deficient performance in counsel's preparation for trial or prejudice from counsel's failure to consult with a narcotics expert or to present expert evidence at trial. The court noted that counsel had ample experience in drug-related cases, and characterized counsel's decision not to call an expert "a strategic decision based on Mr. Baron's years of criminal litigation experience." As to prejudice, the court commented that "while [Detective] Stone's testimony at trial would have explained to the jury how, in 2003, a typical drug deal may have occurred on Nannie Helen Burroughs Avenue, it would have also informed the jury [about] the variety of factors that could affect drug transactions, further suggest-

---

11. Baron testified that discovery documents he received included the PD 163 in Knox's case, photographs of the drugs seized at the carryout, and the PD 95, which included the evidence envelope into which the drugs had been placed. We assume Baron would also have had—or could have obtained—the DEA–7 report on the drugs seized from the carry-out. The trial court did not find, nor does the government argue, that Baron lacked any of the essential facts of the government's case before trial that Detective Stone was later able to use to identify significant discrepancies between the officers' testimony and the practices of narcotics dealers in the area. Counsel must inform himself of the facts of

the government's case-in-chief, and the record indicates that Baron filed a *Rosser* letter requesting discovery.

12. The government did not call a narcotics expert at appellant's trial.

13. Baron specifically agreed, on cross-examination, that a narcotics expert "could probably have given [him] an informed opinion, their expert opinion about how much 10 bags of heroin with that 28 percent purity would have typically sold for, or the price it would have sold for in that Nannie Helen Burroughs area."

ing that some of these factors accounted for the price paid for the drugs in this case." In addition, the court noted, Detective Stone's testimony would have tended to harm appellant's defense because it would have corroborated Officer Johnson's characterization of the area as "an open-air drug market" where drug sales typically occur either early in the morning or in the late afternoon; and it also would have indicated that most of the drug suppliers in the area were "veteran" dealers, an association that may have cast an adverse light on appellant. The court concluded there was no reasonable probability Detective Stone's testimony would have changed the trial's outcome.

### 2. Deficient Performance

 We recently had occasion to consider an ineffectiveness claim based on counsel's failure to consult with a narcotics expert and present expert evidence at trial in *Kigozi v. United States*, 55 A.3d 643, 651 (D.C.2012) (noting that "counsel's investigation before trial is an essential component of effective representation and can be as important to the defense as counsel's performance during trial"). As in *Kigozi*, in this case the trial court erred in characterizing defense counsel's failure to call an expert as a "strategic" choice. Though counsel did state that he rarely found the testimony of experts to be helpful to the defense in drug cases, he did not say that this was the reason he failed to call an expert in this particular case. Instead, as trial counsel testified, he didn't consult an expert because it "didn't occur to [him] to do that." In other words, this was an omission, not a strategic decision. As in *Kigozi*, defense counsel did not explore the relevance of facts known to him pretrial and their import in fashioning a defense. *See id.* at 654 (noting that "the decision not to call an expert at trial cannot be considered a 'tactical' choice to which the court will defer" where "trial counsel's investiga-

tion into what an expert could contribute to challenge the credibility of [witnesses] was unreasonable"); *Cosio*, 927 A.2d at 1123 (en banc) ("[I]t is objectively unreasonable for defense counsel to make an uninformed decision about an important matter without a justification for doing so."). A reviewing court must rely upon trial counsel's actual decision-making process, to the extent it can be discerned, rather than invent "a *post hoc* rationalization of counsel's conduct." *Wiggins v. Smith*, 539 U.S. 510, 526–27, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Thus, as we know from counsel's testimony that he did not consider consulting with a narcotics expert, we do not agree with the trial court's characterization of counsel's decision as "strategic." Rather than a tactical choice, which requires a decision based on proper investigation, in this case counsel simply failed to inquire into the real-world plausibility of the transaction described by the officers despite acknowledging that he could have discussed with a drug expert the amount, purity and alleged price of drugs recovered in this case.

Appellant argues that this omission constituted deficient performance because (i) appellant's trial strategy rested upon discrediting the officers' testimony about the drug transaction they said they overheard, (ii) trial counsel did not have sufficient knowledge about heroin sales and the culture and practices of drug dealers in the area to recognize the inconsistencies in the alleged weight, concentration, price, and manner of drug sales, (iii) trial counsel knew that there were narcotics experts available to the defense who could have elucidated these practices and inconsistencies, and (iv) trial counsel was aware prior to trial that the government intended to call its own expert witness, "and made Detective Stone available to the defense." These facts, according to appellant, would have led competent counsel to consult an expert before trial.

 "Ultimately, '[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable.' " *Cosio,* 927 A.2d at 1127 (quoting *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (alteration in original)). This is an objective standard, *id.,* and the "succinct statement" of this standard that we described in *Cosio* bears repeating: "defense counsel has a basic obligation to 'conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.' " *Id.* (quoting American Bar Association Standards for Criminal Justice, *The Defense Function* 4–4.1(a) (3d ed.1993)). To be sure, this standard " 'does not force defense lawyers to scour the globe on the off-chance something will turn up.' " *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). It does, however, require more investigation than trial counsel performed here. Where the government's case against the defendant turns largely upon the credibility of the government's witnesses—Officers Johnson and Battle, in this case—and where a cursory investigation of the essential facts of the government's case-in-chief that counsel knows or should have known—the price, purity, and amount of the drugs in the drug transaction the officers say they observed—would have revealed evidence that could have called these witnesses' testimony into doubt, trial counsel's failure to conduct an appropriate investigation by consulting with an expert in narcotics transactions constitutes deficient performance.

### 3. Prejudice

 Deficient performance, however, is not enough to warrant reversal; counsel's deficiency must have resulted in substantial prejudice. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. For appellant's claim of prejudice based on an investigative omission to succeed, he must make a two-stage showing: first, he must show there is a "reasonable probability" that "a competent attorney, aware of [the expert opinion], would have introduced it" at trial, *Cosio,* 927 A.2d at 1132 (quoting *Wiggins,* 539 U.S. at 535, 123 S.Ct. 2527); second, he must show a reasonable probability that the jury would have accepted the expert opinion enough to return a different outcome. *Id.* With respect to the first showing, we have little doubt that faced with a head-to-head credibility contest between, on the one hand, the alibi testimony of an impeached defendant and his two friends who said they were all standing at the bus stop, and, on the other hand, two otherwise unimpeached police officers who said they saw appellant selling drugs to Knox in the carryout restaurant, counsel performing competently would have consulted a readily available narcotics expert to test the government's case and presented expert opinion at trial that called the officers' testimony into question. Trial counsel conceded as much at the § 23–110 hearing. Without an expert, however, there was little reason for jurors to doubt the officers' testimony that they observed appellant selling drugs to Knox in the carryout restaurant,[14] and consequently, jurors would have been likely to discredit the alibi testimony of appellant and his friends.

---

14. As in *Kigozi,* this was a technical question: whether an exchange in a public place, as described by the officers, of ten bags with 87 milligrams of 28% pure heroin for $50 was a likely drug transaction in the Nannie Helen Burroughs area. 55 A.3d at 652–53. There

But a government-recognized narcotics expert who has been with the police department and questions the drug transaction Officers Johnson and Battle described would have altered that dynamic and given more credence to the alibi. In short, there was no down-side to calling an expert such as Detective Stone, and much to be gained by it. Thus, we can only conclude that an attorney aware of what an expert could contribute would have called the expert as a witness.

 With respect to the second part of the prejudice showing, we have repeatedly emphasized that there is a "critical difference between reasonable 'probability' and 'possibility' of a different outcome." *E.g., Benton v. United States,* 815 A.2d 371, 374 (D.C.2003) (citing *Strickler v. Greene,* 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). It bears repeating that a reasonable probability, while more than a mere possibility, does not require that counsel's conduct "more likely than not" have altered the outcome. *Id.* (quoting *Strickland,* 466 U.S. at 693–94, 104 S.Ct. 2052). Moreover, what constitutes a "reasonable probability" of a different outcome has to be measured by reference to "the purpose of the defense [which] is to raise a

reasonable doubt in the jurors' minds." *Kigozi,* 55 A.3d at 658 n. 16 ("[T]he evidence need not itself establish a probability ... [i]f the jury had a reasonable doubt, there could be no conviction."). Here there is a reasonable probability that expert testimony, in the context of the other evidence at trial, would have created a reasonable doubt sufficient to forestall conviction.[15] As in *Kigozi,* where a drug expert would have undermined the key witness's testimony, here too, a narcotics expert would have undermined the officers' testimony regarding the transaction. By pointing out that the quantity, concentration, and packaging of the heroin was out of line with drug-dealing practices in the Nannie Helen Burroughs area, and that the $50 price was a fraction of the value of the drugs, counsel could have argued that jurors should doubt the officers' credibility about the drug sale they said they observed in the carryout restaurant. Moreover, the hypothetical scenarios submitted in Detective Washington's affidavit and in briefing to the court that, we will assume, the government would have urged in closing argument to explain the unusual transaction, would have been rebutted as implausible by Detective Stone and were unsupported by the evidence.[16]

---

was no reason to expect that lay jurors would have been attuned to the discrepancies noted in the expert's testimony.

**15.** Here there is a reasonable probability the expert testimony, in the context of the other evidence at trial, would have created a different outcome.

**16.** To summarize, Detective Stone testified that it was unlikely that a dealer in the Nannie Helen Burroughs area would have "fronted" drugs to a reseller in the manner suggested by the government's witnesses. Moreover, in Detective Stone's opinion, fronting transactions are usually negotiated in advance, and it is extremely unlikely that any sort of transaction would have been conducted in public, around strangers. Detective Stone also re-

butted the "tester" scenario, explaining that a tester bag would have contained much less heroin than the 110 mgs. in each of the 10 ziplocks found in the carryout, a tester would not be sold for money but in exchange for 1 or 2 bags for consumption or resale or repayment, the heroin would have been far less pure than the 28% pure heroin found in the carryout, and the testing itself would have occurred pre-packaging during the cutting stage.

Even though Detective Stone recognized that the ordinary manner and price of a drug sale can be affected by, among other things, debts owed by one to another, an immediate need for cash, a pre-existing relationship, or simple inexperience, there was no evidence presented at trial (or at the § 23–110 hearing) that would establish the factual predicates of

Detective Stone's testimony also would have raised a question whether the ten-pack recovered from the floor of the carry-out restaurant was the same small item the officers saw appellant pass to Knox in exchange for $50. Therefore, even if it did not cause jurors to doubt the officers' credibility that they witnessed an exchange of a small object for money, the expert's testimony would have given defense counsel an evidentiary basis to urge jurors to resist drawing the inference on which the government's case depended—that the brown paper containing drugs found on the floor of the carryout restaurant was the unidentified object that the officers saw appellant give to Knox—in light of the stark discrepancy between the $50 price paid in the exchange of the unknown object the officers overheard and the much higher value of the drugs found on the floor. To have a reasonable doubt, in short, a juror would not have needed to find that the officers were lying about what they observed or about the fact that they recovered drugs from the carryout—only that they were mistaken in concluding that appellant was the source of the drugs that Knox threw to the floor when he saw the arresting officers.

With doubt about whether the officers observed a drug transaction, other exculpating pieces of evidence could have gained prominence: appellant had no drugs or drug paraphernalia when he was searched, and his testimony that he had been standing at the bus stop for 20 minutes and had not been in the carryout restaurant just before Knox was arrested was corroborated by two witnesses who testified at trial.[17] *See Kigozi*, 55 A.3d at 657–58 (noting that as expert testimony called into question the government witness, the defense witnesses might have gained credibility, "and the government's [otherwise] circumstantial case might have been perceived as too weak to meet the government's burden of proof beyond a reasonable doubt").

In this case, where the jury had to decide between the officers' testimony that they observed a drug transaction between appellant and Knox in a carryout restaurant and appellant's testimony that he did not go into the carryout restaurant or meet with Knox but had been at the bus station conversing with friends for twenty minutes before the officers made the arrest, there was obvious advantage to be gained by presenting exculpatory evidence from a disinterested witness. When the

these alternative theories, *i.e.*, there was no evidence showing that appellant and Knox had a preexisting relationship, that appellant owed Knox a debt, or that either man—assuming they were dealing in drugs—was inexperienced or misunderstood the amount of drugs being sold. Indeed, on the last point, both the defense and the government's experts agreed that dealers in the Nannie Helen Burroughs area are "veterans," i.e., far from inexperienced.

17. It is also possible that with expert testimony to undermine the officers' testimony, counsel would have changed other aspects of the defense. *See Kigozi*, 55 A.3d at 654–55 (noting that consultation with expert would have provided better alternative to defense that was presented at trial). For example, appel-

lant's alibi that he had been standing at the bus stop could have been established by the two friends who had been there with him, without need for appellant to take the stand. When appellant testified, he was impeached with a number of prior convictions, one of which was drug-related: assault with a dangerous weapon, second-degree theft and possession of a prohibited weapon; attempted unauthorized use of a vehicle; escape; possession of marijuana, and carrying a pistol without a license. In an affidavit filed with his § 23–110 motion, appellant stated that trial counsel "asked me whether I wanted to testify at trial, and I said yes. He did not give me any advice about whether I should testify, and he did not prepare me for my testimony." In his affidavit, trial counsel stated that he did advise appellant.

"tie-breaker" would have been an expert—himself a former police officer—who casts doubt on the officers' testimony (without necessarily impugning their honesty) the likely impact on the jury cannot be underestimated.

We conclude that the trial court erred in finding that trial counsel made a strategic choice not to consult an expert witness, and conclude that trial counsel's failure to consult an expert fell below professional norms. We also conclude, based on the expert evidence proffered at the § 23–110 hearing and in affidavits, that there is a reasonable probability that competent counsel would have called a narcotics expert at trial and that there is also a reasonable probability that such expert testimony, in conjunction with other evidence presented at trial, would have created a reasonable doubt that appellant was guilty of unlawful distribution of heroin. As appellant has demonstrated that his claim of ineffective assistance of trial counsel meets both prongs of *Strickland*, the judgment of the Superior Court is hereby reversed and the case is remanded for a new trial.

*So ordered.*

Dissenting opinion by Senior Judge BELSON.

BELSON, Senior Judge, dissenting:

I agree with the majority opinion's rejection of the appellant's first argument, *viz*, that the evidence seized during the search of his person should have been suppressed. As to his argument that he received ineffective assistance from his trial counsel, I agree with the majority opinion's discussion of the importance of preparation and investigation by defense counsel. I will also assume for the purposes of discussion only that appellant's trial counsel rendered ineffective assistance in that he failed to complete adequate investigation and trial preparation regarding the significance of the relatively high purity of the heroin that was seized.[1] But I do not agree that appellant has made the showing of prejudice required for reversal.

Appellant's argument on appeal is, essentially, that if a narcotics expert like Mark Stone, a former MPD detective, who testified for appellant at the hearing on the § 23–110 motion, had been interviewed before trial by defense counsel and then called to testify at trial about the significance of the high strength of the seized heroin and the way heroin was sold in the area where the appellant's offense allegedly occurred, it is reasonably probable that the jury would have found appellant not

1. It can be argued with some force that trial counsel's performance was not so deficient that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trial counsel attested in an affidavit that he has "handled hundreds of criminal cases in the Superior Court of the District of Columbia. Many of [his] clients in these cases had been charged with narcotics offenses." At the § 23–110 hearing, trial counsel testified that he had consulted with experts for similar cases and found that "for the most part it was not helpful for [his] client." Trial counsel testified that he had believed, correctly as it turned out, that the government would not call an expert at trial, although the government filed notice of an intent to call a narcotics expert. Even if such a witness had been called, it should be noted that the Supreme Court has cautioned that "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, — U.S. —, —, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011). Indeed, "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* at 789–90. As I point out in note 5 below, Stone's testimony might well have harmed appellant's defense.

guilty. The majority opinion agrees with appellant's argument.

I cannot agree. The testimony of Stone at the § 23-110 hearing was itself so ambiguous and inconclusive that it would not have led the jury to disbelieve the police officers' uncomplicated testimony about appellant's actions.

A basic weakness of appellant's argument is that, notwithstanding all of Stone's testimony about how 28% pure heroin was likely to be marketed in the area where appellant was arrested, what the officers saw take place was clearly a drug transaction. Officers Johnson and Battle had been eating while seated in a car close to the front window of the carry-out. The officers had first seen appellant a short time before the exchange when he had been dropped off by an expensive Mercedes SUV and crossed the street and spoken with Knox in front of the carry-out. After they spoke, they entered the carry-out where the officers saw them speak further as they stood by the front window. They were the only persons in the small carry-out aside from an employee who stood behind a plexiglass window.

After appellant and Knox entered the carry-out and continued talking, Officer Johnson entered the carry-out to get ketchup. At that point, appellant and Knox briefly stopped their ongoing conversation, but then concluded it with language signifying that they had struck a deal. Appellant asked Knox, "How much do you have?" Knox answered, "I got you, baby ... I got almost 50 on me" and appellant replied, "yeah, it's going to be—it's going to cost you at least 50." Knox counted out money and gave it to appellant who, in turn, handed Knox a small object that Officer Battle, from outside the window, could see was brown in color.

Most damaging to appellant's effort to show prejudice is that Stone had to acknowledge that drug transactions take place in an almost "infinite variety of ways."

The essential thrust of Stone's testimony was that the charged drug transaction could not have taken place in the manner described by the officers. Stone's testimony was based on the fact that the heroin was found to be of a level of purity well above that of the heroin usually sold in the area of the sale. Starting with that premise, Stone testified that he "can't think of any reason" why the heroin would have sold at such a discounted price.

Stone also said that arrangements between dealer and retail seller would usually be negotiated beforehand because of concerns about the police presence in the area or a potential robbery. Stone, however, had no knowledge of what conversation had taken place between buyer Knox and seller appellant leading to the exchange. The officers witnessed them conversing outside the carry-out and then within it before Officer Johnson entered to get ketchup and heard the final words before the exchange. Nor did Stone know whether they had spoken by telephone or otherwise before they met, almost certainly by appointment rather than by coincidence, outside the carry-out, or what appellant was doing before the officers saw him. For this reason, Stone's testimony that the terms of a deal would normally be worked out beforehand and that parties to such a deal would not normally bargain in a carry-out casts no doubt on the officers' testimony about the transaction.

In an attempt to discredit the evidence that appellant and Knox were engaged in a narcotics transaction, testimony was adduced from Stone that, in a transaction for resale, a dealer usually hands over to a reseller a 12 or 13 pack instead of a pack of only 10 bags. The reseller could then "either use or sell the extra bags" as payment. But this testimony does not help

appellant because of the undisputed fact that the packet of heroin recovered from the floor of the carryout immediately after the transaction was a ten pack.

Stone testified at a different point that a typical arrangement between buyer and retail seller is "to be fronted [2] the ten pack or whatever they are being given and bring the money back to the seller and then repays in drugs." [3] He then said that it was "highly unlikely" that the reseller would make a partial payment (like $50.00) at the time he received the drugs.

All of Stone's statements about what would typically occur are of limited value because he was unaware of the conversations that preceded the transaction, and did not know the existing relationship between appellant and Knox, particularly whether a debt was owed from a prior transaction. Stone also recognized that an immediate need for cash or inexperience could affect the terms of a transaction.[4]

Moreover, the value of Stone's testimony would have been called into question by his statement that the floors of carry-out restaurants "have often been used as stashes as well." The testimony was obviously adduced to explain the presence of the bag of heroin on the floor near Knox. The government responds that the idea that a drug dealer or seller would "stash" illicit drugs on the floor in the middle of a public restaurant is "incredible." This response has added force where the floor of the restaurant in question was bare, and the restaurant was empty except for appellant, Knox, Officer Johnson and an employee behind a plexiglass window.

In light of all of the significant factors as to which Stone had no knowledge and the almost infinite variety of forms that drug transactions can take, Stone's testimony, even if not challenged by contrary expert testimony, is simply too indefinite and lacking in materiality to create a reasonable doubt that the officers saw the drug transaction that they testified they saw.

The already slim likelihood that Stone's proffered testimony would give rise to reasonable doubt in the minds of the jurors is lessened by another factor. The government stated that it would call a narcotics expert whose qualifications equal Stone's to counter Stone's testimony. The government offered the affidavit of Detective Anthony Washington in opposition to the § 23–110 motion. Washington averred that he had testified as an expert more than 500 times in Superior Court and the U.S. District Court for the District of Columbia. As the trial judge brought out at the § 23–110 hearing, Stone and Washington were colleagues, and "were basically the supervisors around [Superior Court] for the resident drug experts."

Washington agreed with Stone that the nature of transactions between a drug dealer and a reseller can vary widely. Contrary to Stone, Washington stated that

---

**2.** The government asked Stone what he meant by "fronted the ten pack." Stone replied, "They are given the ten pack with the obligation or promise to come back with the money. They know again how much money is supposed to be brought back to the person who gave it to them."

**3.** Stone's reference to "repay[ing] in drugs" is confusing, as he then said that the retail seller must bring back the money or pay the consequences, such as "being shot or beat up if that task is not carried out."

**4.** The majority would dismiss the many plausible variables of the Knox-appellant transaction of which Stone was unaware, suggesting that it was somehow the government's burden to adduce evidence of matters such as debt, pre-existing relationships and the like. While appellant and Knox would know about such things, it is unreasonable to expect the government to know about them and to produce evidence about them. Nor are such facts essential elements of the offense of which appellant was convicted.

a reseller may "front" a portion of the total amount owed to the dealer for a ten pack, i.e., pay for part of the value of the ten pack at the time it was received. "This arrangement may occur when the drug dealer and re-seller have engaged in transactions before and have built up a degree of trust in each other." Also contrary to Stone, Washington stated that a dealer sometimes will furnish a reseller with "testers," which are "a small supply of drugs from a new source that a dealer will give or offer at a reduced price to a reseller." The reseller will then distribute the drugs to users, and report back to the dealer on how they were received by buyers or users. While, as appellant's counsel pointed out, Washington was not subjected to cross-examination because he did not testify at the § 23–110 hearing, the thrust of his testimony is clear, even allowing for the fact that he was not cross-examined. Washington's testimony would likely diminish the force of Stone's testimony. But, even unrebutted, Detective Stone's testimony is not enough to establish prejudice.

The majority opinion places considerable reliance on the court's recent opinion in *Kigozi v. United States*, 55 A.3d 643 (D.C. 2012). The majority states that here, as in *Kigozi*, a crucial question that needed expert testimony was a "technical question." *Id.* at 652–53. But, respectfully, the question in this case is hardly comparable to the issue the expert addressed in *Kigozi*. Writing the majority opinion for a divided panel in *Kigozi*, Judge Ruiz observed that, in a case in which the dying declarations of the victim of a shooting were central to the prosecution's case, counsel should have "at least consult[ed] an expert about the possibility that [the dying declarant] was under the influence of PCP ... and the effect that PCP could have had on [declarant's] ability to accurately perceive, recall and report the identity of his assailant." *Id.* at 651–52.

Kigozi argued that he was prejudiced by counsel's ineffective assistance in that counsel failed to call a witness like the nationally-recognized pharmacologist who testified for Kigozi at the § 23–110 hearing. The witness gave technical scientific testimony explaining how the dying declarant's behavior at the time he named appellant Kigozi as his shooter could have been symptomatic of PCP intoxication. Such testimony, Kigozi argued, could have put the dying declarant's identification of Kigozi into doubt. The *Kigozi* majority held that there was a reasonable probability that the outcome of the case would have been different because "[w]ithout [the dying declarant's] accusatory statements, or if the jury had doubts about their reliability, the government's evidence was entirely circumstantial and seriously contradicted by eyewitnesses." *Id.* at 657. In a comparable situation, where available exculpatory evidence would have brought into question the motives of the complaining witness, this court has found prejudice. *Cosio v. United States*, 927 A.2d 1106, 1134–35 (D.C.2007) (en banc).

Reasonable doubt "is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based on reason." Criminal Jury Instructions for the District of Columbia, No. 2.108 (5th ed. rev.2012). To acquit, there must be some reasonable doubt as to appellant's guilt. Unlike the *Kigozi* witness's technical testimony about a specific scientific issue, Stone's broad testimony about the way the drug trade is practiced in the area and the myriad ways in which drug deals take place is so unfocused and lacking in certainty that, when it is considered together with the other evidence, there is not a reasonable probability that it would have caused the jury to reasonably doubt the reliability of the testimony of the officers about what they saw

and heard.[5] As the Supreme Court stated in *Harrington v. Richter, supra* note 1, —— U.S. ——, ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011), "[t]he likelihood of a different result must be substantial, not just conceivable." Respectfully, appellant's showing here falls well short of meeting that test.

Accordingly, I would affirm.

---

5. Moreover, if Stone had testified at trial, his testimony, even if not rebutted, could have harmed appellant. Stone described the Nannie Helen Burroughs neighborhood in 2003 as a "close knit veteran heroin trafficking area" and the relationship between the buyer and seller as "a close relationship ... a trusting relationship." A jury, listening to Stone's testimony, could become more likely to convict appellant after hearing him associated with a "veteran heroin trafficking area" and impliedly described as having close relationships with drug dealers and sellers. The majority again attempts to demonstrate that Stone's testimony would have called the government's evidence into doubt, but it just as likely could have been detrimental for appellant.